Robert Thornton **MORRISON**, Robert Neilson **Boyd** and **Allyn and Bacon, Inc.**, Plaintiffs,

v.

T. W. Graham **SOLOMONS** and John **Wiley & Sons, Inc.**, Defendants.

No. 78–6280.

United States District Court, S. D. New York.

July 18, 1980.

---

Lankenau, Kovner & Bickford, Gibney, Anthony & Flaherty, New York City, for plaintiffs; John C. Lankenau, Josephine Lea Iselin, Harriette K. Dorsen, New York City, of counsel.

Paskus, Gordon & Hyman, New York City, for defendants; Philip H. Schaeffer, Alan M. Goldston, Jane D. Connolly, New York City, of counsel.

LASKER, District Judge.

For many years the text "Organic Chemistry" written by Robert T. Morrison and Robert Neilson Boyd, then Professors of Chemistry at New York University, and published by Allyn & Bacon, Inc., has been the most popular book in its field for the teaching of beginning courses to college students. In 1976 T.W. Graham Solomons wrote, and John Wiley & Sons, Inc., published Solomons' text, also entitled "Organic Chemistry," directed at the same audience as that of Morrison and Boyd. The writers and publishers of Morrison and Boyd have sued the writer and publisher of Solomons alleging copyright infringement. The case was tried to the court over a period of four months. This expenditure of time was required because the plaintiffs alleged some 800 to 900 instances of copying. The cumulative impact of these instances together with an alleged similarity of chapter structure and organization add up, the plaintiffs say, to a "substantial similarity" which proves copying. There is no dispute that Solomons had access to Morrison and Boyd. Indeed, in the course which he taught at the University of Southern Florida, Morrison and Boyd was the assigned text; and the plaintiffs allege that Solomons utilized his lecture notes—which generally took off from Morrison and Boyd—as intermediary source material for his text.

For the reasons indicated below the complaint is dismissed.

This memorandum deals with two subjects. First, the credibility of T.W. Graham Solomons who, as indicated below, throughout his exceptionally long testimony unqualifiedly denied copying Morrison and Boyd. This testimony is found to have been fully credible. Second, an analysis of instances of categories of alleged copying

which, in spite of the large number asserted and put into evidence failed to outweigh Solomons' testimony or to meet plaintiffs' burden of proof.

### I.

This non-jury case was commenced in the latter part of 1978. The necessity to rule on pre-trial proceedings including plaintiff's motion for a preliminary injunction and several important discovery matters, as well as the study of lengthy and excellent pre-trial memoranda submitted by the parties, educated the court before trial as to the issues and, to more than an ordinary degree, the facts.

The trial commenced December 3, 1979 and continued until March 31, 1980, with comparatively minor interruption. The record stands at 8,228 pages and the court's notes at 763.

At the close of the plaintiffs' case (which took four to five weeks of trial and included the testimony of Professor Robert Morrison and three experts) the defendants moved for a dismissal of the complaint on the grounds that the plaintiffs had not proven a prima facie case. That motion was argued for the better part of a half day after the submission of briefs as well as detailed charts and graphic exhibits. In denying the motion, the court observed that in the posture of the case as it then stood "the question was a close one"; "I do not think that the propositions that have been put before me [by the plaintiffs] are capricious. On the other hand, I am not at all certain as to what their ultimate significance is; [nor have I] bought the [defendants'] argument that there is nothing here." The claims of the plaintiffs have at all times been regarded with utmost seriousness.

The defendants have presented the testimony of T.W. Graham Solomons and his wife, Judith Solomons. At the close of the testimony of Dr. Solomons, the defendants moved to dismiss the complaint "on the basis of the record presently before the court." In support of their motion, defendants have submitted supporting and reply briefs of 108 and 115 pages, respectively,

together with an appendix of approximately 200 pages, commenting on the plaintiffs' analysis of Dr. Solomons' testimony. The plaintiffs have submitted an answering brief of 248 pages. This material has been studied with care, as have relevant references to the record, appropriate exhibits and controlling legal decisions. The history of the case and the voluminousness of the documentation put before the court are mentioned to emphasize how considerable the court's exposure to the case has been prior to this decision.

\*     \*     \*     \*     \*     \*

T. W. Graham Solomons testified for 22 days which were roughly evenly divided between direct and cross-examination. The determination of his credibility must be made not only on the basis of the testimony of Dr. (and Mrs.) Solomons itself but by weighing their testimony against the conclusions reached by plaintiffs' witnesses Doctors Morrison, Martin, Rinehart and Stock. It must also be reached with a consciousness that Dr. Solomons and his wife testified as fact witnesses, while plaintiffs' witnesses necessarily testified, except for Dr. Morrison, exclusively as experts.

When a judge sits as the finder of fact, as the Court of Appeals has recently stated:

"His role is not that of a passive observer. His obligation is to determine the facts in a field which is exceedingly complex and technical." *In re International Business Machines Corporation*, 618 F.2d 923, 930 (2d Cir. 1980).

As Judge Frank observed in *In re J. P. Linahan*, 138 F.2d 650, 653–54 (2d Cir. 1943):

".  .  . because [a Judge's] fact-finding is based on his estimates of the witnesses, of their reliability as reporters of what they saw and heard, it is his duty, while listening to and watching them, to form attitudes towards them. He must do his best to ascertain their motives, their biases, their dominating passions and interests, for only so can he judge of the accuracy of their narrations. He must also shrewdly observe the strata-

gems of the opposing lawyers, perceive their efforts to sway him by appeals to his predilections. He must cannily penetrate through the surface of their remarks to their real purposes and motives. He has an official obligation to become prejudiced in that sense. *Impartiality is not gullibility. Disinterestedness does not mean child-like innocence. If the judge did not form judgments of the actors in those court-house dramas called trials, he could never render decisions."* (emphasis added)(footnotes omitted).

█ As to the determination of the credibility of witnesses, juries are charged that the truthfulness or dependability of a witness is to be determined by his demeanor on the stand, his relationship to the case, the possibility of his being biased or partial or not being biased or partial, the reasonableness or unreasonableness of his statements, the strength or weakness of the witness' recollection and the extent to which the witness has either been corroborated or contradicted by testimony of other witnesses or by his own prior inconsistent statements or by exhibits or stipulations. Applying these standards and fulfilling the responsibilities of a judge as fact-finder as described above in *Linahan*, I find the testimony of Judith and T. W. Graham Solomons to be credible in all respects and on the basis of that finding, I conclude that Dr. Solomons has not violated plaintiffs' copyright by copying the Morrison and Boyd text as alleged. Accordingly, defendants' motion is granted and the complaint is dismissed.

Among the reasons for which I have found Dr. and Mrs. Solomons' testimony to be credible are:

First: In his 22 days of testimony Dr. Solomons was subjected to the most searching possible inquiry. During the entire period his response to nearly every question was satisfactory and complete. By using the word "nearly" I do not mean to suggest any residual consideration of untruthfulness on his part but only that on some occasions he showed himself subject to the normal frailties of human error or forgetfulness. Indeed many of these occasions gave proof of his candor.

Second: Dr. Solomons' education and teaching and writing experience, but above all, his comprehensive and impressive grasp of the subject of organic chemistry and his remarkable ability to articulate intelligibly the complex subject matter at hand negates plaintiffs' theory that Dr. Solomons was incapable of writing his own text or writing it within the time period in which it was produced.

Third: Dr. Solomons' testimony is of a piece. It is either true or substantially, if not wholly, fabricated. If his five week testimony was fabricated, it must surely have been the greatest tour de force in chemical or educational history.

Fourth: Nothing in the record suggests a motive for Dr. Solomons to plagiarize. As I have indicated, his grasp of the subject was such that he had no need unfairly to adopt any material from other writers. Moreover, the risk to his reputation, if he had plagarized and been found to do so, would have caused such chaos and destruction in his professional and personal life that it is not plausible that a man of his training and knowledge of the subject would take that risk.

Fifth: Dr. Solomons' credibility is not inconsistent with the credibility of plaintiffs' witnesses: that is, that he told the truth does not mean that they did not. There is no doubt that the facts as to which plaintiffs' witnesses testified were true and I find that their opinions were sincerely and truly held by them. Thus, this is not a classic swearing contest and the finder of fact need not—and in this case does not—call into question the truthfulness of the witnesses on one side because he finds witnesses on the other side to be telling the truth.

II.

The finding that Dr. Solomons' testimony is fully credible is itself sufficient to require the dismissal of the case. It is indeed the actual basis for the dismissal of the complaint which in fact has been dismissed in a

statement from the bench incorporating the material contained in Part I above. Accordingly, it is unnecessary to discuss below the items of alleged copying in the same detail as would obviously be required if the basis of dismissal were that the two works were not "substantially similar" within the meaning of the decisions of this court and the Court of Appeals of this Circuit construing the Copyright statute. The purpose of this section is solely to illuminate the subject for the benefit of the parties (who have requested some expression of views by the court) and for possible use in any further proceedings in the litigation.

Plaintiffs base their claims of substantial similarity between the Solomons and Morrison and Boyd texts on evidence that purports to establish copying of chapter organization, topic selection, tables, figures, formulae, chemical reactions, problems and common errors. The briefs of the parties have treated as one group "items" consisting of the material other than problems, common errors and structure and organization. The discussion below follows that classification.

*A. Items Other than Problems, Common Errors, Structures and Organization*

■ Plaintiffs contend (Brief, p. 4) that "although there is no verbatim copying [by Solomons] of extensive sections of material, there is verbatim copying in an extensive and concentrated way in chapter after chapter of expressions and phrases artfully rearranged as paraphrases." However, plaintiffs have not met their burden of proof on this point. I have found the hundreds of "correspondences" which plaintiffs have placed in evidence not to establish copying, in the face of Dr. Solomons' testimony, for the following reasons:

1. To prove that the hundreds of "correspondences" between Solomons and Morrison and Boyd were "strikingly similar" and not the result of coincidence or dictated by the technicalities of the subject, plaintiffs offered the testimony of three expert witnesses, Drs. Martin, Rinehart and Stock. The testimony of these gentlemen, acknowledged to rank high in their fields, was based on a system of comparison between the correspondences of the principal texts (Solomons and Morrison and Boyd) on the one hand, with the correspondences or lack of correspondence between Solomons (or Morrison and Boyd, as the case may be) with certain comparative texts in the same field.

A degree of arbitrariness is necessarily inherent in such a scheme. The choice of the comparative texts and of the number of the comparative texts, can, for example, make an enormous difference in determining whether correspondences between the principal texts appear to be conspicuous or do not. To illustrate, by an admittedly extreme example, if only one outside text is chosen to compare with the principal texts, and if that outside text does not contain the material as to which there is a correspondence between the principal texts, one might conclude that there was an oddity about the correspondence between the principal text because 100% of the comparative texts did not contain the allegedly copied material. However, if ten comparative texts are chosen as a basis for comparison and nine of them contain the corresponding material, the verdict would clearly go the other way. Plaintiffs' experts, of course, did not rely on comparison of the principal texts with only one or two others but generally with five or six. Yet, there were many more comparative texts in existence than they used as a standard for determination of whether correspondences between the principal texts were probative of copying or not. Indeed, during the course of the defendant's case many of those texts were put into evidence and cast considerable doubt on the validity of the conclusions reached by plaintiffs' experts which had been based on other comparative texts.

2. The material identified by plaintiffs' witnesses often consisted of similarities of idea or information, material which, of course, is not copyrightable. See, for example, Transcript at 1208–9, 1218, 1574–76, 1601, 1656, 1709, 1767, 1785–86, 1844, 1971–72, 2552, 2586, 3674, 3677–78. Moreover, on a number of occasions where correspondenc-

es of subject matter clearly existed, it was equally obvious that its expression differed significantly between the principal texts. See Transcript at 2886, 2742, 1574–76, 2951–2952, 3677. Indeed, as Dr. Martin agreed, in many instances the only method by which Solomons could have avoided any "similarity" or "correspondence" would have been to avoid the subject then at hand altogether.

3. Many of the correspondences alleged to violate the copyright statute consisted merely of commonplace items clearly inherent in and required by the necessity of the subject being taught. For example, plaintiffs contend that Solomons' use of various modes of chemical "nomenclature," copied Morrison and Boyd. Yet the use of accepted nomenclature—terms of art and professional definitions—is clearly indispensible to the teaching of any subject as sophisticated as organic chemistry. Consequently its actual use is of insignificant probative value on the question of copying. It is true that plaintiffs attempted to demonstrate certain peculiar uses of terms of nomenclature which were used similarly by Morrison and Boyd but even as to these the subject is too weak a reed upon which to rely.

4. Many of the items asserted as correspondences between the principal texts occurred with substantial frequency or regularity in comparative texts, (see, for example, Rinehart testimony, Tr. 2523) or contained such fundamental material that the expert agreed that that material would naturally be included in any competent text (Tr. 2540).

Furthermore, most of the passages of text asserted as "correspondences" were of a short and fragmentary nature. The total sum of the 800 to 900 correspondences, numerous as they were, did not cumulatively constitute a significant portion of either text, a proposition not surprising, since Solomons' text, for example, runs 1,057 pages in length. The commonplace nature of many alleged correspondences, their fragmentary nature, and the limitation of the accumulated volume of alleged copied material in relation to the entire text, casts substantial doubt on the proposition of copying. It also undermines the claim that the principal texts are substantially similar within the meaning of copyright law.

## B. Problems

■ Many of the reasons underlying the finding that the correspondences described above were insufficient to establish copying apply to the allegation that Solomons copied various problems from Morrison and Boyd. The total number of problems as to which such allegation is made was small: about 20 of the 814 problems in Solomons and 704 in Morrison and Boyd. Many of the problems dealt with matters fundamental to the subject or essentially simple, which other authors also used. In the cases of some problems that were used in common by the principal texts, the method of expression differed. Moreover, where correspondences occurred there was a widely disparate placement of the problems in one book as compared to the other. That is to say, a problem claimed to be common to both books might occur in one book in the second chapter and in the other in the twelfth or eighteenth. The placement of material in a text book is significant to the question of substantial similarity. A text book is a teaching instrument. The order of teaching is fundamental to the accomplishment of the book's purpose. Variations in placement, when they arise frequently—as they do in the case of these texts—tends to undermine the claim of substantial similarity.

## C. Common Errors

Plaintiffs claim that the existence of approximately twenty errors shared in common between the principal texts is powerful evidence of Solomons' copying. At first blush it is natural to assume that an error appearing in both texts must have been copied by the defendant from the plaintiffs. In this case, however, there are significant reasons for doubting such a conclusion. First, the evidence established that the errors common to the principal texts were also common to many of the comparative texts, permitting the conclusion either that

the profession as a whole was in error on a particular point at a particular time or that Solomons derived erroneous material from an erroneous text or texts other than Morrison and Boyd or both. Second, it is acknowledged that at least some errors occurring in Morrison and Boyd were not copied by·Solomons (see testimony of Dr. Martin, Tr. 1544). Moreover, the cases do not hold existence of common errors to justify a conclusion of copyright violation except where it has been shown to occur on a widespread basis such as to constitute "faithful copying." See, for example, *Southwestern Bell Telephone Co. v. Nationwide Independent Directory Service, Inc.*, 371 F.Supp. 900 (W.D.Ark.1974); *College Entrance Book Co. v. Amsco Book Co.*, 119 F.2d 874 (2d Cir. 1941) on which plaintiffs rely. The law of this Circuit casts considerable doubt upon the probative value of copied items as evidence of copyright violation. The most recent expression on this subject is *Hoehling v. Universal City Studios, Inc.*, 618 F.2d 972 (2d Cir. 1980). There, citing such classic opinions as *Rosemont Enterprises, Inc. v. Random House, Inc.*, 366 F.2d 303 (2d Cir. 1966), *cert. denied*, 385 U.S. 1009, 87 S.Ct. 714, 17 L.Ed.2d 546 (1967); *Oxford Book Co. v. College Entrance Book Co.*, 98 F.2d 688 (2d Cir. 1938) and *Greenbie v. Noble*, 151 F.Supp. 45, 67 (S.D.N.Y.1957), the court stated:

"Each appellee had the right to 'avail himself of the facts contained' in Hoehling's book and to 'use such information, whether correct or incorrect, in his own literary work.'" (618 F.2d 979, quoting *Greenbie, supra*, at 67).

Finally, it is important to note that Dr. Solomons was extensively examined and cross-examined as to the errors in his book which were common with Morrison and Boyd and that he satisfactorily explained their derivation from sources other than Morrison and Boyd.[1]

*D. Organization and Coverage*

Plaintiffs place considerable emphasis on correspondences which they claim to exist between the subject matter and the organizational structure of the chapters and subchapters in both books. The evidence on this point is clearly outweighed by Dr. Solomons' denials of copying.

Plaintiffs offer no proof as to the extent to which the common structure of the books was not "normal" to the subject or exceeded the "norms" of other books. This is not surprising since it is to be expected that introductory texts on such a subject as the *introduction* to organic chemistry would cover pretty much the same subjects and would present them in roughly the same order. Moreover, as Professor Morrison agreed, Morrison and Boyd lays out its subject on a "traditional basis" (see Transcript at 430). In the preface to the first edition, (Plaintiffs' Exhibit 3), the authors write "We have deliberately retained traditional organization by family because it emphasizes the dependence of properties on molecular structure" and the preface to the second edition (Plaintiffs' Exhibit 2) says: "We have retained the basic organization of the first edition: according to family." Yet plaintiffs contend that Solomons' organization by family is one of the indicia of his copying Morrison and Boyd.

The principal texts do contain a number of chapter and subchapter headings which are identical or substantially identical. Plaintiffs rely on these headings as establishing that the contents of the chapters and subchapters of both books are the same. This is too great a leap to make if it is intended to establish copying. It is, of course, true that where the chapter headings and subchapter headings are identical, the same material is treated by both books. Yet plaintiffs of course do not contend that

---

1. Solomons did not take the position that he had never consulted Morrison and Boyd. To the contrary, he frankly asserted that he resorted to it and many other text books for use on fundamental matters, and in particular, data and numbers. We have not combed the record to see whether among such propositions one or more of the items utilized from Morrison and Boyd fell into the common error group. But whether they did or not, it is appropriate to state that Solomons' "admissions" of the use of other text books appeared to be evidence of candor, not of evasion, elusiveness or deceit.

they have the right to a monopoly of the subject matter. The significant question is not whether titles of subchapters and chapters are the same but rather whether the explanation or treatment of the subject matter within them is substantially similar. As to that issue chapter and subchapter headings cast very little light.

At the argument on defendant's motion to dismiss at the end of the plaintiffs' case, the defendant placed in evidence Exhibits A47 through O47, fifteen graphs which demonstrate how the principal texts are organized and structured, and what are the similarities and differences between them. Although the court denied defendant's motion to dismiss at the end of the plaintiffs' case, it did even then observe that the graphs established that "there are enormous differences in the places where all this material is to be found in the two books, and that is an important point." The "important point" made by the graphs has been considerably strengthened by the testimony of Dr. Solomons and the material presented on the defendant's case. Their cumulative effect, substantially outweighs plaintiffs' evidence that the structure and organization of the Solomons book was derived from that of Morrison and Boyd.

## A WORD ABOUT THE LAW

The rights of an author under the copyright statute derive from the provision of article 1, section 8 of the Constitution, which empowers Congress

"[t]o promote the Progress of Science and useful Arts, by securing for limited Times to Authors and Inventors the exclusive Right to their respective Writings and Discoveries."

■ The objective of the constitutional provision and of the statute is to benefit the public by making available to it the writings of authors and the benefits of invention. The means of accomplishment is the production of an author's or inventor's exclusive right for a limited time. Inevitably, the question arises as to what constitutes the "writings" of an author. Writings consist of at least three elements: facts, ideas and expression. It is accepted that ideas are not copyrightable nor is a fact by itself. The special difficulty arises, however, in determining the extent to which the factual element of a writing is protectable under the statute when it constitutes the fruits of research. Competing considerations are at play, both affecting the public interest: if the protectable scope of an author's writings is too narrowly defined he will be discouraged from further writing. If, however, the protectable scope of the original author's work is too broadly defined, creative work by other authors will be discouraged. A balance must be struck.

In this Circuit the limitation of protection afforded the writing of an author was stated with characteristic lucidity by Judge Learned Hand in *Arnstein v. Edward B. Marks Music Corporation*, 82 F.2d 275 (2d Cir. 1936) to be:

"The 'sole liberty of printing, publishing and vending' the 'work' means the liberty to make use of the corporeal object by means of which the author has expressed himself; it does not mean 'the sole liberty' to create other 'works,' even though they are identical. Were it not so the man who first made and copyrighted a photograph under [the copyright statute], could prevent everyone else from publishing photographs of the same object."

Judge Hand's formulation has been regularly applied in this Circuit to define the scope of protection of scholarly research. A classic treatment of it is found in *Oxford Book Co. v. College Entrance Book Co.*, 98 F.2d 688, 691 (2d Cir. 1938). In discussing the protectability of historical material constituting a major element of the plaintiff's writing, the Oxford court observed:

"The subject matter is of necessity what events have made it and the order of treatment whether that be chronological or topical is fixed by the facts. Even the somewhat limited matter of selection is curtailed in such condensed works, designed for elementary school study, as those with which we are here concerned.

For the foregoing reasons no need exists for analyzing in detail the fairly nu-

merous places in the text in each book where substantially the same thing on the same subject has been said in different words. . That was proper enough and, indeed, inevitable if both books were to serve their purpose. They had to contain the more important facts of history. This being so, no sound reason remains for saying that the accused book in its text is a copy of any substantial part of the copyrighted book. True it is that at times one or more descriptive words used in the plaintiff's book are utilized to describe the same thing in the defendants' but in no material respect are the same words gathered together sufficiently to show that the copyrighted work was copied. Mere similarity of phraseology which has, indeed, become more or less stereotyped in some respects in school histories is a weak support for a charge of infringement."

As recently as March, 1980 the Court of Appeals of this Circuit reasserted the rule in *Hoehling v. University City Studios, Inc.,* supra, 618 F.2d at 979–80:

"The cases in this circuit, however, make clear that factual information is in the public domain. . . . Accordingly, there is little consolation in relying on cases in other circuits holding that the fruits of original research are copyrightable. *See, e. g., Toksvig v. Bruce Publications Corp.,* 181 F.2d 664, 667 (7th Cir. 1950); *Miller v. Universal City Studios, Inc.,* 460 F.Supp. 984 (S.D.Fla.1978). Indeed, this circuit has clearly repudiated *Toksvig* and its progeny. In *Rosemont Enterprises, Inc., supra,* 366 F.2d at 310, we refused to 'subscribe to the view that an author is absolutely precluded from saving time and effort by referring to and relying upon prior published material. . . . It is just such wasted effort that the proscription against the copyright of ideas and facts . . . are designed to prevent.' *Accord,* 1 *Nimmer on Copyright* § 2.11 (1979).

 *       *       *       *       *       *

In works devoted to historical subjects, it is our view that a second author may make significant use of prior work, so long as he does not bodily appropriate the expression of another. *Rosemont Enterprises, Inc., supra,* 366 F.2d at 310. This principle is justified by the fundamental policy undergirding the copyright laws— the encouragement of contributions to recorded knowledge. The 'financial reward guaranteed to the copyright holder is but an incident of this general objective, rather than an end in itself.' *Berlin v. E. C. Publications, Inc.,* 329 F.2d 541, 543–44 (2d Cir.), *cert. denied,* 379 U.S. 822, 85 S.Ct. 46, 13 L.Ed.2d 33 (1964). Knowledge is expanded as well by granting new authors of historical works a relatively free hand to build upon the work of their predecessors."

These clear expressions of policy apply with full force in the instant case.

■ Knowledge is, of course, expanded just as much (some would argue more) by granting new authors of scientific works a relatively free hand to build upon the work of their predecessors as by granting the right to historians. Solomons did not "bodily appropriate the expression" of Morrison and Boyd. His sole use of that text was to secure from it factual information, the use of which does not constitute a violation of the copyright statute.

For the reasons stated above, the complaint is dismissed.

This opinion constitutes the findings of fact and conclusions of law required by Rule 52 of the Federal Rules of Civil Procedure.

It is so ordered.