Dennis W. ECKES and James Beckett, III, Plaintiffs-Appellants,

v.

CARD PRICES UPDATE and Suffolk Collectables, Defendants-Appellees.

No. 1150, Docket 83–7920.

United States Court of Appeals, Second Circuit.

Argued May 9, 1984.

Decided June 8, 1984.

Herman Kaufman, New York City (Litman, Kaufman & Asche, New York City, of counsel), for plaintiffs-appellants.

Salvatore A. Alamia, Babylon, N.Y., for defendants-appellees.

Before FEINBERG, Chief Judge, WINTER, Circuit Judge and LASKER, District Judge.*

FEINBERG, Chief Judge:

Dennis W. Eckes and James Beckett, III, appeal from a judgment of the United States District Court for the Eastern District of New York, I. Leo Glasser, J., 575 F.Supp. 459 (E.D.N.Y.1983), finding that appellee companies, Card Price Update and Suffolk Collectables, had not infringed appellants' soft-covered book, entitled the "Sport Americana Baseball Card Price Guide" (the Guide). Following a non-jury trial, the court found that while the Guide was protected by the copyright laws, appellants had failed to prove that appellees had copied from the Guide in putting together their work, entitled "Card Prices Update" (CPU). For the reasons stated below, we believe the court erred in concluding that there was no infringement, and we reverse the judgment of the district court.

I.

The schoolyard passion for flipping baseball cards apparently engenders lasting interest for a sizeable part of the population, since this lawsuit arises out of the adult hobby of collecting baseball cards. The facts can be briefly stated: Appellants wrote the Guide, and published it in approximately February 1979. The book was copyrighted and registered. A second edition of the Guide also was copyrighted, registered and issued in approximately March 1980. The Guide is a comprehensive listing of baseball cards manufactured in the 70-year period from 1909 to 1979. Appellees concede that the Guide is the first extensive listing of its kind.

The Guide lists some 18,000 different baseball cards and in each case furnishes the going market price. Some cards are quite valuable. For example, appellant Eckes testified that a set of 407 cards released by Topps Chewing Gum Company in 1952 sells now for $7,000–$8,000, and that the Mickey Mantle card in this group is worth about $800. Each card is listed in a number sequence in each of approximately 100 different sets, with the corresponding price of each card. A set includes all cards of the same type or design produced by a particular manufacturer during a calendar year. The Guide also gives the prices for each card according to its condition: mint, very good/excellent and fair/good. In addition, the cards are placed into two groups: premium or star cards, and common cards. There are approximately 5,000 of the former, and they are considered particularly valuable because of the player featured on the card, e.g., a hall of famer, a rookie of the year, or because of the team on which he plays, or because of some characteristic of the card itself, such as an imperfection or the scarcity of the card. Common cards consist of the remaining cards listed in the series covered.

The Guide is primarily the product of appellant James Beckett, III, a statistician with a Ph.D. in statistics. Beckett had been interested in baseball collecting for some time prior to producing the Guide, and had written a nationwide price survey of baseball cards. Beckett testified that he worked on the Guide for 40 hours a week for eight straight months. Relying on his extensive knowledge of trading in baseball cards and his background in statistics, Beckett compiled the prices for all the cards and placed them into either the premium or common category.

Some three months after the Guide was released, Mark Lewis, a principal of appellee companies, decided to publish a monthly "update" of baseball card prices. Lewis admitted he was "new" to baseball card collecting but claimed the creation of CPU was "a very simple process." It was so simple, according to Lewis, that it took him only nine weeks to publish the first issue of CPU, including accumulation of informa-

* Honorable Morris E. Lasker, Senior United States District Judge for the Southern District of New York, sitting by designation.

tion on thousands of cards. CPU was published in a newspaper form, indicated the trends in prices by a plus or minus and listed separately only premium cards; however, its listing contained substantially the same 5,000 cards that the Guide had listed as premium cards. Although CPU appears to list only one price for each card, CPU, like the Guide, actually offers different prices for each card listed. CPU's "Condition Guide," located on the inside cover, explains that prices for cards vary according to given percentage multiples, depending on the condition of each card. Though Lewis conceded access to the Guide, testifying it was a "bible" and that "Beckett was the authority," Lewis vigorously and persistently denied copying from the Guide in producing CPU. Nevertheless, many of the prices and pictures in CPU are the same as those in the Guide, and a number of inadvertent errors in the Guide, including misspellings, inconsistent use of abbreviations and obvious omissions, are repeated in CPU. In addition, there was testimony of public confusion as to whether CPU was an update of, or otherwise connected with, the Guide.

In June 1980, appellants brought suit in the district court for copyright infringement. After a trial before Judge Glasser, the judge found for appellees. The court characterized Lewis's testimony as "evasive," and also found the testimony of appellants' witnesses "entirely credible." The court found the Guide to be a protected work under copyright law and that appellees' choice of premium cards was sufficiently similar to appellants as to warrant "a suspicion of copying." Nevertheless, although the judge thought the issue was "extremely difficult," he held that the "variations" between the two publications in the prices listed for the cards "render [appellees'] work not so substantially similar as to justify a finding of copyright infringement." 575 F.Supp. at 464 (footnote omitted). This appeal followed.

## II.

In this court, appellants contend that the Guide contains the requisite originality to warrant copyright protection, and that there was ample proof of copying. Not surprisingly, appellees disagree on both counts; they particularly press their contention, rejected by the district court, that appellants' copyright registration is invalid and unenforceable. We consider that question first.

In order to prove copyright infringement, appellants "must show ownership of a valid copyright and copying by the defendant." *Novelty Textile Mills, Inc. v. Joan Fabric Corp.*, 558 F.2d 1090, 1092 (2d Cir.1977). Appellants introduced into evidence a timely obtained Copyright Office certificate of registration, which "constitute[s] prima facie evidence of the validity of the copyright . . .," 17 U.S.C. § 410(c). Appellees claim that the presumption of validity was overcome because there were material omissions on appellants' application form submitted to the Copyright Office. In particular, appellees contend that appellants "failed or refused to complete" portions of the copyright registration form regarding their previous works: "Sport Americana Bicentennial Edition 1976" and "Sport Americana 1978 Edition." However, we agree with the district court's findings that the 1979 publication of the Guide represented a substantial change from the 1976 and 1978 publications. The latter consisted merely of baseball card set checklists; the Guide, on the other hand, was a more comprehensive listing, which assigned values for each card listed, depending on their condition. Also, the Guide classified the cards into two groups, those selling at only average prices (common cards) and those commanding higher than average prices (premium cards).

In addition, the court clearly and justifiably believed that appellants' omissions in the copyright application were inadvertent and innocent. Only the "knowing failure to advise the Copyright Office of facts which might have occasioned a rejection of the application constitute[s] reason for holding the registration invalid and thus incapable of supporting an infringement

action ... or denying enforcement on the ground of unclean hands...." *Russ Berrie & Co., Inc. v. Jerry Elsner Co., Inc.*, 482 F.Supp. 980, 988 (S.D.N.Y.1980) (citations omitted); see also *Thomas Wilson & Co. v. Irving J. Dorfman Co.*, 433 F.2d 409, 412 (2d Cir.1970) (one error made in "good faith" and the other "clearly innocent" omission), cert. denied, 401 U.S. 977, 91 S.Ct. 1200, 28 L.Ed.2d 326 (1971); *Advisors, Inc. v. Wiesen-Hart, Inc.*, 238 F.2d 706, 708 (6th Cir.1956) (per curiam) ("an innocent misstatement ... in the affidavit and certificate of registration, unaccompanied by fraud or intent to extend the statutory period of copyright protection, does not invalidate the copyright, nor is it thereby rendered incapable of supporting an infringement action"), cert. denied, 353 U.S. 949, 77 S.Ct. 861, 1 L.Ed.2d 858 (1957). Accordingly, we agree with the district court that the presumption of 17 U.S.C. § 410(c) was not overcome because of fraud.

■ Appellees next argue that the Guide cannot be protected under the Copyright Act of 1976, 17 U.S.C. §§ 101 et seq. Appellees recognize, as they must, that compilations are specifically protected under the Act. Id. § 103. The Act defines a compilation as "a work formed by the collection and assembling of preexisting materials or of data that are selected, coordinated, or arranged in such a way that the resulting work as a whole constitutes an original work of authorship." Id. § 101. Appellees contend, however, that copyright protection does not extend either to the *idea* of a baseball card compilation, id. § 102(b); *Mazer v. Stein*, 347 U.S. 201, 217–18, 74 S.Ct. 460, 470–71, 98 L.Ed. 630 (1954) (protection covers only expression of idea and not idea itself), or to facts and information contained in the compilation, cf. *Harper & Row, Publishers, Inc. v. Nation Enterprises*, 723 F.2d 195, 202–04 (2d Cir.1983), cert. granted, —— U.S. ——, 104 S.Ct. 2655, 81 L.Ed.2d 362 (1984); *Hoehling v. Universal City Studios, Inc.*, 618 F.2d 972, 979 (2d Cir.), cert. denied, 449 U.S. 841, 101 S.Ct. 121, 66 L.Ed.2d 49 (1980). Appellees contend that once the

idea of a baseball card compilation and the facts contained in it are removed from the Guide, there is simply nothing left to protect, especially where the format is required by the nature of the subject matter.

Copyright law and compilations are uneasy bedfellows since "the very vocabulary of copyright law is ill suited to analyzing property rights in works of nonfiction." Denicola, Copyright in Collections of Facts: A Theory for Protection of Nonfiction Literary Works, 81 Colum.L.Rev., 516 (1981). Indeed, while this court has recognized that the "distinction between fact and expression is not always easy to draw," *Harper & Row Publishers, Inc.*, supra, 723 F.2d at 203, we have been particularly restrictive in the protection of non-fiction works indicating, for example, that the fruits of another's labor in lieu of independent research obtained through the sweat of a researcher's brow, does not merit copyright protection absent, perhaps, wholesale appropriation. See *Hoehling*, supra, 618 F.2d at 979; *Rosemont Enterprises, Inc. v. Random House, Inc.*, 366 F.2d 303, 310 (2d Cir.1966), cert. denied, 385 U.S. 1009, 87 S.Ct. 714, 17 L.Ed.2d 546 (1967); see also *Miller v. Universal City Studios, Inc.*, 650 F.2d 1365, 1371–72 (5th Cir.1981); 1 M. Nimmer, Nimmer on Copyright § 3.04, at 3–16–16.1 (1983) (criticizing notion that fruits of original research are protectible but noting that original selection of public domain materials may itself be protectible). But see, e.g., *Schroeder v. William Morrow & Co.*, 566 F.2d 3, 6 (7th Cir.1977); *Rand McNally v. Fleet Management Systems*, —— F.Supp. ——, 2 Copyright L.Rep. (CCH) ¶ 25,624, at 18,804–06 (N.D.Ill. December 31, 1983); *National Business Lists, Inc. v. Dunn & Bradstreet, Inc.*, 552 F.Supp. 89, 91–95 (N.D.Ill.1982).

Nevertheless, our cases do not hold that subjective selection and arrangement of information does not merit protection. In fact, the definition of a compilation in the Act, 17 U.S.C. § 101 (*"selected,* coordinated, or arranged") (emphasis added), the commentators, see, e.g., 1 M. Nimmer, supra, § 2.04[B], at 2–41–2 ("originality involved

in the *selection* and/*or* arrangement of such facts" protected literary work) (footnote omitted) (emphasis added); Denicola, supra, at 530 ("originality in plaintiff's *selection* or *choice* of data"; Denicola, however, believes that the labor in compiling facts is protected) (emphasis in original), and the cases, see, e.g., *Roy Export Co. v. Columbia Broadcasting System, Inc.*, 672 F.2d 1095, 1103 (2d Cir.), cert. denied, 459 U.S. 826, 103 S.Ct. 60, 74 L.Ed.2d 63 (1982); *Dow Jones & Co. v. Board of Trade*, 546 F.Supp. 113, 116 (S.D.N.Y.1982), suggest that selectivity in including otherwise non-protected information can be protected expression. In *Roy Export*, supra, the plaintiff's selection of unprotected Charlie Chaplin film clips constituted a protectible original creative work. Similarly, in *Dow Jones & Co.*, supra, the court found that plaintiff's "subjective judgment and selectivity involved in determining" which stocks it would list made the list a copyrightable compilation.

We have no doubt that appellants exercised selection, creativity and judgment in choosing among the 18,000 or so different baseball cards in order to determine which were the 5,000 premium cards. Accordingly, we believe that the Guide merits protection under the copyright laws.

### III.

The remaining issue before us is whether the district court erred in finding that appellants had not proven that appellees copied appellants' selection of premium cards. We have held that in the absence of direct copying, "a plaintiff may prove copying by showing access and 'substantial similarity' of the two works." *Novelty Textile Mills, Inc.*, supra, 558 F.2d at 1092. There is no issue here as to access. Thus, if there are substantial similarities between appellants' and appellees' material, as there certainly are here, then " 'the absence of any countervailing evidence of creation independent of the copyrighted source may well render clearly erroneous a finding that there was not copying.' " Id. at 1092 n. 2, quoting *Roth Greeting Cards v. United Card Co.*, 429 F.2d 1106, 1110 (9th Cir. 1970).

There was a scarcity of credible, non-self-serving proof in the record of independent creation by appellees. Lewis testified that he did not copy from the Guide, but the district court justifiably found that appellees' testimony as to the source of its premium price list was "evasive." The list of 5,000 premium cards in both works is acknowledged to be substantially the same, and we believe that it was impossible for appellees to produce the same list without copying. Cf. *Wainwright Securities, Inc. v. Wall Street Transcript Corp.*, 558 F.2d 91, 96 (2d Cir.1977), cert. denied, 434 U.S. 1014, 98 S.Ct. 730, 54 L.Ed.2d 759 (1978) (almost wholesale verbatim appropriation of most original aspects—financial analysis and predictions—of plaintiff's work); *Adventures in Good Eating v. Best Places to Eat*, 131 F.2d 809, 811 (7th Cir.1942) (defendant's claim that similarity in wording due to similarity in source not convincing since it would not explain "existence of such close and parallel wording, [or] ... the substantially same selection of places listed in the respective books.") It is certainly true that some baseball cards would appear as premium on any baseball card collector's list; however, the choice as to many is necessarily subjectively based, for example, on regional differences. If there is one thing baseball fans would argue about, it is which players belong in the group of all-time best or most popular. Indeed, appellant Eckes testified that appellants often disagreed among themselves as to whether a given card was in the premium or common card category, and appellant Beckett testified that there was a similar divergence of opinion among the various dealers.

Moreover, while there may not have been direct testimony of copying, there was strong credible evidence of it, as noted above, through common errors in the two works. As noted by Professor Nimmer, "the courts have regarded the existence of common errors in two similar works as the strongest evidence of piracy...." 3 M. Nimmer, supra, § 13.03[C], at 13.38.2–.3 (footnote omitted). See also *College Entrance Book Co. v. Amsco Book Co., Inc.*, 119 F.2d 874, 875 (2d Cir.1941). Here,

there are numerous common errors. For example, the Price Guide inadvertently omitted from its 1963 Topps list the card for Bill Virdon, a rookie of the year in the mid-fifties and later a manager for the New York Yankees. It appears undisputed that the Virdon card would qualify as premium. Strikingly, the listing of the same set in CPU has the same omission despite the fact that CPU purports to list all premium cards. Similarly, there is an inexplicable identity between the Guide and CPU with respect to the particular manner in which the 1933 "Delong" set is checklisted. Although many of the listings of cards in the various series in the Guide contain the first and last name of the player listed, the Guide lists only the players' last names in the "Delong" series with two exceptions: "Lou Gehrig" and "W. Terry." The CPU "Delong" checklist matches this pattern completely; CPU's checklist, with the exception of "Lou Gehrig" and "W. Terry," uses the players' last names only. Further examples of indisputable copying abound in the record.

In considering the issue of copying, the district court stated that while there were "marked similarities" between the two works, it

must be recognized that since the plaintiffs' work is regarded as the authority in the field, it is entirely possible that the prices in their publication not only reflect market prices, but in fact can determine market prices. Thus, any subsequent publication accurately reflecting which cards are being traded at a premium would, of necessity, bear strong similarities to the plaintiffs' work.

575 F.Supp. at 464. It may be that a copyrighted work, here a listing of premium cards, can be so successful that it establishes the "market," but there is no credible evidence in the record to support application of this theory here. Moreover, there is no basis for such an inference in light of the short time in this case between the issuance of appellants' Guide and appellees' CPU. In addition, this argument would best be advanced in a fair use context, that is, that it is necessary to copy the premium cards and prices from appellants'

book because their book establishes which cards are premium and the respective prices of each card. Cf. *Consumers Union of United States, Inc. v. General Signal Corp.*, 724 F.2d 1044, 1049–51 (2d Cir. 1983) (discussing fair use in primarily informational work), petition for cert. filed, 52 U.S.L.W. 3875 (U.S. June 5, 1984). However, appellees do not contend that they made fair use of the Guide; they claim that they did not copy from it at all. The judge's finding that they did not was clearly incorrect.

Finally, the copying was particularly egregious here because the first issue of CPU used as its "base" prices (the prices CPU was ostensibly "updating" according to its title) the prices actually reported in the Guide. The combination of this with CPU's appropriation of the premium card selection of the Guide gave the misleading impression that CPU had actually been authorized to "update" the prices in the Price Guide.

In sum, we find that appellee has infringed protected expression contained in appellants' Guide. Accordingly, we reverse the judgment of the district court, and remand the case for further proceedings on the issues of damages and equitable relief.