**J.R. O'DWYER COMPANY, INC., Plaintiff,**

v.

**MEDIA MARKETING INTERNATIONAL, INC., and Paul Holmes, Defendants.**

**No. 90 Civ. 6960(MEL).**

United States District Court, S.D. New York.

Jan. 25, 1991.

**600**

Harold Wm. Suckenik, New York City, for plaintiff.

David Halperin, P.C., New York City (David Halperin, Steven T. Halperin, of counsel), for defendants.

LASKER, District Judge.

J.R. O'Dwyer Company Inc. ("O'Dwyer") moves for a preliminary injunction pending final determination of its copyright action against Editorial Media Marketing International, Inc. ("EMMII")[1] and its president, Paul Holmes. A hearing on the preliminary injunction was held November 20, 1990, during which the defendants moved to dismiss O'Dwyer's complaint and for attorneys' fees and costs.

O'Dwyer's motion for a preliminary injunction is denied because he has not established probable success on the merits, and because the balance of hardships tips in

---

**1.** EMMII was erroneously identified as "Media    Marketing International, Inc." in the complaint.

favor of the defendants. Defendants' motions "to dismiss" O'Dwyer's complaint and for costs are denied.

### Findings of Fact

This suit alleges copyright infringement by defendants of plaintiff's annual directory of public relations firms. O'Dwyer has for over twenty years published an annual directory of such firms. Defendants in October 1990 released a directory of public relations firms as a supplement to their magazine, "Inside PR." Plaintiff's principal contention is that the Inside PR directory infringed O'Dwyer's copyright by listing over ninety-five percent of the roughly 1,250 firms listed in O'Dwyer's 1990 directory.

Jack O'Dwyer has spent a lengthy career as a journalist covering the public relations industry. In 1968, he began publishing an industry newsletter, and in 1969 he published the first of what became an annual directory of public relations firms (entitled "O'Dwyer's Directory of Public Relations Firms"). His publications, and particularly his directories, are considered authoritative in the public relations industry.

O'Dwyer testified that he initially developed his directory data base through industry contacts and newsletter subscribers. He updates his publication annually by sending two mailings to newsletter subscribers and firms listed in his previous directory, as well as to firms from which he received press releases during the preceding year; additionally, he makes roughly 500 follow-up calls. O'Dwyer further stated that he excludes from his directory many firms that desire to be listed (either on the grounds that they are not "true PR firms" or because they fail to pay a twenty-five dollar printing fee which he imposed in recent years as a condition for inclusion in his directory), and that he obtains information and includes listings for certain firms despite their lack of cooperation with him. He does not verify listings submitted to him.

A rough summary of O'Dwyer's criteria for inclusion is that all public relations firms that subscribe to his newsletter are listed, as is anyone who pays for inclusion, and as are a few firms which O'Dwyer deems too important to omit despite their lack of interest in being listed. O'Dwyer believes that the selection of firms to be included lies at the heart of his creative effort. He did, however, acknowledge that all the raw data he used was publicly available from sources other than his directory.

O'Dwyer employs a uniform format for directory listings, indicating each listed agency's name, address, phone number, specialization (if any), names of significant officers and employees, number of employees and years in business, and major clients. Additionally, since 1986 O'Dwyer has allowed listed firms to obtain for a fee the inclusion of a brief "agency statement," written by the firm, in the body of its listing. The "agency statement" option has been offered since 1986. There are only thirty "agency statements" appearing in the entire O'Dwyer directory.

In the 1990 edition (as in each edition since the early 1970s), each directory page is printed in two columns. The 1990 edition lists roughly 1250 U.S. firms, with agency names printed in bold-faced capital letters (enlarged print or custom graphics are used for firms who have paid a fee for more prominent inclusion). The 1990 edition is a soft-covered book of over 400 pages, with an alphabetical listing of American firms occupying pages 155 through 316. The book also includes listings of firms abroad, rankings of firms by city, by area of specialization, and by fees received annually, and numerous advertisements. A copyright notice appears on page one.

Holmes is the president of EMMII, a two-year-old company which has published the monthly magazine "Inside PR" since March 1990, and which published a similar magazine called "Relate" from March 1989 through February 1990. The October 1990 issue of Inside PR featured a special supplement called the "PR Agency Yellow Pages," which contained listings for roughly 2,000 public relations firms. Holmes hopes to publish such a "Yellow Pages" edition annually.

Holmes testified that he developed his listings of public relations firms by combing a 25,000 entry mailing list his magazine had acquired from Adweek magazine, as well as from his industry connections and from press releases he had received. He sent a mailing to roughly 2,000 firms on his list, and made follow-up calls to numerous firms to solicit advertisements. Holmes specifically and emphatically denied copying names from O'Dwyer's directory, or copying O'Dwyer's format.

In developing his directory's format, Holmes stated that he asked his subscribers what information they would want available in a public relations directory, and asked potential advertisers what information they would want to disseminate. Holmes acknowledged that he knew of O'Dwyer's directory and looked through it in considering what information he wanted to feature in his listings. He testified that he also considered other similar directories in developing his own, including the Adweek Agency Directory (which lists over 6,000 advertising agencies), the "Green-Book" (a 1987 directory of marketing research firms), and "Hollis" (a British directory of press and public relations concerns).

The Inside PR directory totals sixty-eight pages, including advertisements and alphabetized listings from pages 10 through 57. The magazine also lists selected agencies by city and by area of specialization, of which only ten of seventeen categories also appear in O'Dwyer's directory. Listings are arranged in two columns, as in the O'Dwyer directory as well as in Hollis and the GreenBook; however, unlike O'Dwyer's directory the great majority of the Inside PR directory's listings are only one line long, and contain only the agency's name, address, and telephone number. Roughly 150 "enhanced listings" were sold. They provide extra information and are displayed more prominently. Ninety of these "enhanced listings" include "agency statements," which, as in O'Dwyer's directory, were provided by the agencies in question. Agency names in the non-enhanced listings are in bold print and not all in capitals, while the enhanced listings are denoted with a "bullet" on the left margin, and are printed in larger bold letters that are all capitalized. The type face is the same as that used in Inside PR's regular editions, and differs from that in the O'Dwyer directory.

A number of firms included agency statements in both the O'Dwyer and the Holmes directories, with considerable similarity in most instances and even identity in some. Testimony was heard from several employees of firms who had submitted agency statements both to O'Dwyer and to Holmes. In all cases, the firms themselves, rather than either O'Dwyer or Holmes, wrote and submitted their statements. There was no testimony that Holmes requested the submission of statements identical to those in O'Dwyer's directory. As documents admitted into evidence reflect, Holmes merely advised firms of the opportunity to submit statements and printed what they submitted.

It is not surprising that many of the resulting submissions were similar to those contained in the O'Dwyer directory. Indeed, Gerald Schwartz, the president of a public relations firm listed prominently in both directories, noted that he also disseminated virtually identical copy in other informational materials about his company, while Jill Murphy, the vice president of a holding company with roughly thirty subsidiary public relations firms, testified that her firm's submissions were standard materials suitable for multiple uses, and that her attitude about the material she submitted was that there was "no one use for a certain set of words."

While the two directories share several general characteristics, such as being arranged alphabetically in two columns with firm names in bold print, neither their general "look" nor their specific wording is strikingly similar. There are substantial differences in the publications' overall appearance and content and the similarities are so mundane as to be generic to directories in general.

Holmes' testimony that he did not copy from O'Dwyer's publication was altogether credible. His manner was forthright, and

his testimony as to how he developed his directory was consistent and plausible.

Holmes' denial that he copied anything from O'Dwyer's directory is made more credible by his testimony that while preparing his directory edition, he consulted with an attorney concerning copyright issues raised by publication of his directory. Holmes was advised that as long as he performed his own research, he would be protected from liability under copyright laws. His cognizance of copyright issues and his specific belief that avoiding actual copying was essential to prevent copyright liability provided him with ample motive to avoid "shortcuts" like lifting names from O'Dwyer's directory, and, again, support his testimony concerning the extensive independent research he performed.

O'Dwyer identified several examples of apparent "common errors" which he asserts indicate that Holmes copied listings from the O'Dwyer directory. However, these instances were infrequent, and Holmes has convincingly illustrated that the errors were either created independently or were not in fact common to both publications.

Most asserted common errors involved punctuation or capitalization of firm names. For example, listings for firms including Northlich, DuDell & Associates, and InterCommunications all contain capitalization errors, which O'Dwyer argues indicate that Holmes copied listings from O'Dwyer's entirely capitalized listings. However, Holmes' mailing list data base, which was the source for most of his listings, also is entered entirely in capital letters. Thus errors in capitalization are equally likely to derive from transposition of firm names from Holmes' mailing list as from copying from O'Dwyer's directory. O'Dwyer's observation that certain listings with unusual capitalization were correctly listed in Holmes' directory does not negate Holmes' explanation; it merely indicates that his familiarity with public relations firms enabled him to correct errors that otherwise would have occurred whether he was copying from O'Dwyer or from his own mailing list.

Both O'Dwyer and Holmes mistakenly list M Booth & Associates with a period mark (.) following the letter M. However, Holmes plausibly testified that his standard practice was to follow apparent initials with periods. Again, his departure from this practice in some other listings does not indicate that he copied in this instance.

A final type of common error was the listing of at least two firms under names which had in fact been changed. Again, however, given the credible testimony of both O'Dwyer and Holmes that they developed their listings from mailing lists which had been developed before their directory research efforts began, the existence of such common error is not sufficient proof of copying.

A further indication that the "common errors" do not prove copying is the fact that Holmes did not replicate all errors in O'Dwyer's directory. For example, the name of Elias Buchwald, an officer of the firm Burson–Marsteller, is correctly spelled in Holmes' directory, but is misspelled in O'Dwyer's.

Given the absence of evidence of meaningful common errors or indications of copying other than the identity of many firms listed, the public availability of all information contained in O'Dwyer's directory, the extensive research performed and submissions independently obtained by Mr. Holmes and his staff, and the fact that Holmes lists roughly 800 firms not listed in O'Dwyer's directory, I find, on the record as it stands, that O'Dwyer has not established probable success on the question whether Holmes in fact did compile the list of his included firms independently. Even if O'Dwyer may be said to have raised a serious question, as outlined below, the balance of hardships does not tip in O'Dwyer's favor.

Moreover, I find credible Holmes' statement that at the time he published his directory he was unaware of O'Dwyer's use of the term "agency statement" in his directory and did not copy it. The term is sufficiently descriptive to be easily conceived without reference to O'Dwyer's directory, and its use is so infrequent in

O'Dwyer's directory that it could easily have been missed even by a more-than-casual reader. Moreover, Holmes' manner in discussing the term "agency statement" was, as throughout his testimony, highly sincere and credible.

### Conclusions of Law

To obtain preliminary relief, O'Dwyer must establish possible irreparable harm and either the probability of success on the merits or sufficiently serious questions going to the merits to make them a fair ground for litigation and a balance of hardships tipping decidedly in his favor. *Consumers Union of United States v. General Signal Corp.*, 724 F.2d 1044, 1048 (2d Cir. 1983), *cert. denied*, 469 U.S. 823, 105 S.Ct. 100, 83 L.Ed.2d 45 (1984); *Dallas Cowboys Cheerleaders, Inc. v. Pussycat Cinema, Ltd.*, 604 F.2d 200, 206–07 (2d Cir.1979); *Dow Jones & Co. v. Board of Trade*, 546 F.Supp. 113, 115 (S.D.N.Y.1982).

In order to prove copyright infringement, O'Dwyer "must show ownership of a valid copyright and copying by the defendant." *Novelty Textile Mills, Inc. v. Joan Fabrics Corp.*, 558 F.2d 1090, 1092 (2d Cir.1977).

The Copyright Act defines a "compilation" as:

[A] work formed by the collection and assembling of pre-existing materials or of data that are selected, coordinated, or arranged in such a way that the resulting work as a whole constitutes an original work of authorship.

17 U.S.C. § 101 (1988).

The copyright protection afforded such compilations is also statutorily defined:

The copyright in a compilation or derivative work extends only to the material contributed by the author of such work, as distinguished from the pre-existing material employed in the work, and does not imply any exclusive right in the preexisting material.

17 U.S.C. § 103(b) (1988).

At the hearing on the motion, O'Dwyer stated that his claim arises primarily from Holmes' alleged use of O'Dwyer's directory as a basis for his own directory, either through the direct copying of names from O'Dwyer's directory into Holmes' directory or as a source of firms to contact and obtain essentially identical submissions for inclusion in his own directory. O'Dwyer also alleges that Holmes copied the term "agency statement" from O'Dwyer in violation of the Copyright Act.

■ O'Dwyer's directory plainly is a compilation as defined by Section 101. In this Circuit, the Scylla and Charybdis of cases defining the copyrightability of compilations are *Financial Information, Inc. v. Moody's Investors Service, Inc.*, 808 F.2d 204 (2d Cir.1986), *cert. denied*, 484 U.S. 820, 108 S.Ct. 79, 98 L.Ed.2d 42 (1987), and *Eckes v. Card Prices Update*, 736 F.2d 859 (2d Cir.1984).

In *Financial Information*, the Court of Appeals for the Second Circuit affirmed the District Court's determination (which it characterized as factual) that the mere assembly of five facts from bond redemption announcements into a standard bond report format was "insufficient proof of 'independent creation' to render the Daily Bond Cards copyrightable." *Financial Information*, 808 F.2d at 207–08. While *Financial Information* addressed only the copyrightability of the individual cards in question, because they were not published as an assemblage or series, *id.* at 208 n. 3, it does define when individual entries derived from external sources, such as those in O'Dwyer's or Holmes' directories, may be copyrighted.

As in *Financial Information*, the task of assembling the information contained in any one listing in O'Dwyer's directory was pure rote. The provision of name, address, and numbers and names of employees, as well as the inclusion of client lists and some further information if submitted by the listed firm, into an entirely straightforward format typical of directories in many industries, lacks the requisite originality to support a copyright over the individual entry.[2] Accordingly, if O'Dwyer's claim is to

**2.** O'Dwyer argues that certain firms refused to submit information at all, or withheld some

succeed, it must rest on his aggregation of listings into a directory, rather than on each individual listing.

*Eckes*, unlike *Financial Information*, concerned a compilation of a large number of separately submitted items included in one published volume. *Eckes* reversed a ruling, following a full trial, that a plaintiff publisher of a baseball card price guide did not prove copying where a rival publisher selected essentially the identical 5,000 cards as "premium cards" and there were numerous other indications of copying, where the choice of "premium cards" required considerable selectivity, and where there was not significant evidence suggesting an absence of copying. *Eckes*, 736 F.2d at 864.

The Court of Appeals for this Circuit in *Eckes* noted that it has rejected copyright protection based solely on the author's "sweat of the brow," stating that,

"[W]e have been particularly restrictive in the protection of non-fiction works indicating, for example, that the fruits of another's labor in lieu of independent research obtained through the sweat of another's brow, does not merit copyright protection absent, perhaps, wholesale appropriation."

*Id.*, 736 F.2d at 862. Despite this reluctance, however, the *Eckes* court observes that the Circuit's cases

suggest that selectivity in including otherwise nonprotected information can be protected expression.... [and that appellants'] selection, creativity and judgment in choosing among the 18,000 or so different baseball cards in order to determine which were the 5,000 premium cards [rendered the compilation copyrightable].

*Id.*, 736 F.2d at 863. *See also Dow Jones & Co.*, 546 F.Supp. at 116 (Dow Jones' selectivity in determining which stocks to list in its indexes made actual list of stocks copyrightable).

information such as a client list, and that his efforts to secure that information warrant copyright protection for his directory. While O'Dwyer's efforts to compile and include such summaries of these firms' businesses despite

O'Dwyer's firm listings, like the baseball card guide in *Eckes*, derive whatever originality they possess from O'Dwyer's selection of included firms. O'Dwyer stressed in general terms that he took pains to include only "true PR firms," and that determining which firms to include was at the heart of his creative effort. While he did acknowledge that in fact he would list any subscriber to his newsletter or any firm willing to pay the printing fee for inclusion, his inclusion of certain publicity-averse firms and his solicitation of listings from many other firms does constitute sufficient authorship to render his listings a copyrightable compilation.

The remaining question with regard to O'Dwyer's probability of success on the merits is whether O'Dwyer has shown copying by Holmes. Given access, which here is conceded, and given the existence of substantial similarities between the two works, which is demonstrated by Holmes' listing of over ninety-five percent of firms listed by O'Dwyer, *Eckes* observes that " 'the absence of any countervailing evidence of creation independent of the copyrighted source may well render clearly erroneous a finding that there was not copying.' " *Eckes*, 736 F.2d at 863, quoting *Novelty Textile Mills*, 558 F.2d at 1092 n. 2.

While access and substantial similarity support a finding of copying and may compel such a finding absent other factors, nevertheless, "such evidence does not *require* the trier of fact to find copying," at least where the defendant has introduced evidence of independent creation to rebut the plaintiff's showing. *Novelty Textile Mills*, 558 F.2d at 1092 n. 2 (emphasis in the original). *See also Morrison v. Solomons*, 494 F.Supp. 218 (S.D.N.Y.1980) (consistent and credible testimony of defendant supports finding of no copying despite ample evidence of access and substantial similarity).

their lack of participation may make those items copyrightable, no evidence of copying was introduced as to those particular listings. Accordingly, their potential copyrightability need not be evaluated here.

In *Eckes*, the Court of Appeals reversed a finding of no copying where the District Court found the defendant's testimony as to independent creation to be "evasive," and where the Court of Appeals believed it to be "impossible for appellees to produce the same list without copying," especially given the extremely subjective judgment required to produce a list of "premium baseball cards." *Eckes*, 736 F.2d at 863. Additionally, the Court of Appeals pointed to convincing evidence of "numerous common errors" as bolstering the case for a finding of copying. *Id.* at 864.

The factors identified in *Eckes* as mandating a finding of copying are absent here, and several factors which here suggest independent creation were lacking in *Eckes*. Holmes' testimony was in no way evasive; indeed, it was direct, sincere and thoroughly credible. Holmes' several years of experience in the industry and his efforts at independent research support his assertion that he did not copy names from O'Dwyer's directory. There were relatively few common errors, many of which were readily explained and equally likely caused by means other than copying.

Other factors supporting a finding of no copying here and distinguishing this case from *Eckes* include Holmes' directory's inclusion of roughly 800 firms not listed in O'Dwyer's directory, his receipt and printing of numerous entries submitted directly by listed firms, and specific acts of original authorship he undertook, including independent mailings to roughly 2,000 firms, numerous follow-up calls, and close review of his mailing lists for other candidate firms. Holmes' extensive acts of independent authorship are particularly compelling, and contrast with the absence of credible indications of independent authorship identified in *Eckes*.

O'Dwyer also argues that Holmes' use of the term "agency statement," which O'Dwyer also uses to designate descriptions submitted by listed firms, infringes O'Dwyer's copyright. However, that term is too descriptive and generic to warrant copyright protection. *See, e.g., Dow Jones & Co.*, 546 F.Supp. at 115–16 (discussing originality requirement and observing that copyrightable writings "do not include labels which simply designate or describe the articles to which they are attached and which have no value separate from the articles") (quoting *Nimmer on Copyright* § 208[G][2] (1981), now appearing at 2–129 (1990)). Moreover, even if the term were copyrightable, as discussed above the infrequency and lack of prominence of the term's use in O'Dwyer's directory, combined with its obviousness and with Holmes' credible explanation that he conceived of the term independently, compel a determination that Holmes in fact did not copy O'Dwyer's use of the term "agency statement."

■ Accordingly, I conclude that Holmes has made a sufficient showing at this stage to rebut any presumption of copying, and that, conversely, O'Dwyer has failed to establish, on the record as it stands, that he probably will succeed on the merits. Nor can O'Dwyer prevail on the alternate basis for granting injunctive relief. Assuming for the purposes of this motion that he has presented serious questions for determination, nevertheless the balance of hardships clearly and decidedly tips in Holmes' favor.[3]

Several considerations inform the question of the relative hardship which would be felt by the parties should the preliminary injunction be granted. O'Dwyer's business is large and well-established, with his directory sales varying from 1,700 to 2,400 per year. He has not presented any evidence, other than a conclusory assertion, that Holmes' alleged infringement has caused or will cause him to suffer any damage to his sales, advertising or other revenue, or reputation. Further, because the Holmes directory was distributed as a

---

**3.** Because this decision rests on a finding of an absence of copying, it does not address a possible claim by Holmes that even had he copied names from O'Dwyer's directory, that use would be protected under fair use doctrine. *Cf. Con-* *sumers Union of United States, Inc. v. General Signal Corp.*, 724 F.2d 1044, 1049–51 (2d Cir. 1983) (discussing fair use in a primarily informational work).

supplement to the October 1990 issue of Inside PR, the vast majority of whatever harm its publication will visit on O'Dwyer has occurred already.

Holmes' directory, and indeed his magazine, are new and are struggling to establish a market niche. While it is true that he has completed the bulk of the expected distribution of his directory, the inability to accept orders for additional directory copies would undoubtedly harm his reputation and put him out of business with regard to the directory.

Accordingly, O'Dwyer's motion for a preliminary injunction is denied.

Holmes' "motion to dismiss" the complaint, which functionally is a motion for summary judgment because it implicates questions of fact, is denied. A summary judgment motion cannot be granted where its outcome depends on the ultimate determination of disputed facts.

There is no basis for the awarding of costs.

It is so ordered.