### DATA GENERAL CORPORATION and Data General Service, Inc., Plaintiffs,

v.

### GRUMMAN SYSTEMS SUPPORT CORPORATION, Defendant.

### Civ. A. No. 88–0033–S.

United States District Court, D. Massachusetts.

May 11, 1993.

---

Robert S. Frank, Jr., Kevin P. Light, Choate, Hall & Stewart, Boston, MA, Jacob Frank, Morris G. Nicholson, Data General Corp., Westboro, MA, for plaintiffs.

David J. Apfel, Paul F. Ware, Goodwin, Proctor & Hoar, Gary L. Benton, Andrew M. Gold, and Ronald S. Katz, Coudert Brothers, San Francisco, CA, for defendant.

Gary R. Greenberg, Louis J. Scerra, Jr., Goldstein & Manello, Boston, MA, Charles A. Gilman, Robert A. Alessi, Cahill, Gordon & Reindel, New York City, for Grumman Data Systems Corp.

MEMORANDUM AND ORDER ON PLAINTIFFS' MOTION FOR LEAVE TO ADD A PARTY AND TO AMEND COMPLAINT, DEFENDANT'S MOTION TO CORRECT JUDGMENT, DEFENDANT'S MOTION FOR A NEW TRIAL OR REMITTITUR, AND DEFENDANT'S MOTION FOR JUDGMENT AS A MATTER OF LAW

SKINNER, Senior District Judge.

Following a vigorously litigated trial spanning more than nine weeks, the jury returned a verdict against defendant Grumman Systems Support Corporation. The jury awarded Data General $27,417,000 on its federal copyright infringement claim and $27,417,000 on its state law misappropriation of trade secrets claim, Mass.Gen.L. ch. 93, § 42. Finding Grumman's misappropriation of trade secrets to be willful, I increased the trade secrets award by $9,000,000. This court entered judgment, in the form submitted by Data General, on January 29, 1993.

Four contested post trial motions are now pending. Data General moves for leave to add a party and to amend its complaint to conform to the evidence presented at trial. Grumman moves (1) to correct judgment, (2) for a new trial or, in the alternative, a remittitur, and (3) for judgment as a matter of law. The parties have exhaustively briefed each motion. I have summarized the facts of this case in prior opinions and will not repeat them here except as is relevant to issues under discussion.

*I. Plaintiff's Motion To Add A Party And To Amend Complaint*

In an effort to increase the likelihood of collecting the full amount of its jury verdict, Data General moves to amend its complaint to add a new claim against a new party, Grumman Data Systems Corporation ("GDS"), the parent corporation of defendant Grumman. Data General asserts that the evidence at trial demonstrated, as a matter of law, that GDS is vicariously liable for Grumman's infringement of Data General's

copyright because GDS had the right and ability to supervise Grumman's infringing activity and a direct financial interest in Grumman's activities. Plaintiff contends, further, that such an amendment is permitted under Fed.R.Civ.P. 15(b) (Amendments to Conform to the Evidence) and Fed.R.Civ.P. 21 (Misjoinder and Non–Joinder of Parties).

Non-party GDS made a special appearance with this court for the purpose of filing an opposition to Data General's motion. GDS, joined by Grumman, levels a number of challenges to Data General's efforts: (1) due process bars addition of a new party, on a new claim, after judgment; (2) neither the local rules of this court nor the federal rules of civil procedure allow the relief plaintiff seeks; (3) this court lacks personal jurisdiction over GDS; (4) plaintiff extinguished its copyright claim when it accepted judgment on the larger damage award available under state law, and cannot now pursue GDS on a theory of vicarious copyright liability. I need not address many of the issues raised by GDS because I conclude that the relief that Data General seeks is not permitted by Rule 15(b) or Rule 21.

■ When an issue not embraced by the pleadings is tried with the express or implied consent of the parties, Rule 15(b) permits a party to amend the pleadings to reflect the case as it was actually litigated.[1] Such an amendment can be allowed at any time, even after judgment. Fed.R.Civ.P. 15(b). A party may resort to Rule 21 to add a party who for some innocent reason has not been made a party to the action and whose presence is necessary or desirable. "Parties may be dropped or added by order of the court ... at any stage of the action and on such terms as are just," Fed.R.Civ.P. 21, even after trial or on appeal. Wright, Miller & Kane, 7 Federal Practice and Procedure: Civil § 1688 (1986). Where the motion to amend comes after responsive pleadings have been served, the standard for adding a party is the same whether the motion is made under Rule 15 or Rule 21 because in both cases the moving party must demonstrate an absence of prejudice to the nonmoving party. *Kalman v. Berlyn Corp.,* 914 F.2d 1473, 1479 (Fed.Cir.1990), *reh'g, en banc, denied* (1991); Wright & Miller, 6 Federal Practice and Procedure: Civil § 1474 (1986).

To prevail on its Rule 15(b) motion, Data General must show that (1) the vicarious liability cause of action was, in effect, tried consensually by the parties and resolved favorably to the plaintiff and (2) granting the motion to amend will not unfairly prejudice the defendant Grumman or the party to be added, GDS. *See DCPB, Inc. v. City of Lebanon,* 957 F.2d 913, 916–17 (1st Cir.1992). Data General fails to clear either hurdle.

There is no allegation that Grumman or GDS expressly consented to trying the vicarious liability claim. Data General argues, instead, that GDS had actual notice that the unpleaded issue was raised at trial and had an adequate opportunity to defend its interests. The vicarious liability of GDS was purportedly raised and decided by the following trial testimony: GDS employees comprise the senior management of Grumman and have the right to supervise and control Grumman; GDS is the sole shareholder of GDS; GDS employee Joseph Mulderig was a central defense witness for Grumman; GDS employee William O'Neil was Grumman's designated representative at trial; and GDS in-house counsel was present at counsel table throughout the trial. The issue before me, however, is not whether the evidence presented at trial might somehow support a new theory of liability, but rather whether the parties consented to try the unpleaded issue of GDS' vicarious liability. "Consent to the trial of an issue may be implied if, during the trial, a party acquiesces in the introduction of evidence which is relevant only to that issue." *Id.* at 917. Conversely, when evidence admitted at trial is relevant to a pleaded issue, it cannot give rise to a claim that the oppos-

1. Fed.R.Civ.P. 15(b) states, in relevant part: When issues not raised by the pleadings are tried by express or implied consent of the parties, they shall be treated in all respects as if they had been raised in the pleadings. Such amendment of the pleadings as may be necessary to cause them to conform to the evidence and to raise these issues may be made upon motion of any party at any time, even after judgment; but failure so to amend does not affect the result of the trial of these issues.

ing party should have realized that a new issue was infiltrating the case. *Id.* Here, the evidence upon which Data General grounds its claim of vicarious liability was relevant to determining the existence and extent of Grumman's liability, as I ruled during trial. "The purpose of Rule 15(b) is to allow the pleading to conform to issues actually tried, not to extend the pleadings to introduce issues inferentially suggested by incidental evidence in the record." *Id.* (quoting *Grand Light & Supply Co. v. Honeywell, Inc.,* 771 F.2d 672, 680 (2nd Cir.1985)). GDS was not a party to the suit, in fact or in form. There is nothing to suggest that GDS and Grumman were treated as a single entity, or that GDS, its actions, or its liability were ever an issue in this case. Accordingly, I cannot conclude that Grumman or GDS were on notice that a new issue—the vicarious liability of GDS—was being raised at trial.

Data General's attempt to amend the complaint fails for a second reason: unfair prejudice to GDS and Grumman. Despite knowing of the facts that purportedly give rise to GDS' vicarious liability, Data General waited four years to file its motion to amend—until after trial, after the jury verdict, and after judgment. Though a Rule 15(b) motion may be granted even after the entry of judgment, our court of appeals has noted that a district court should consider the extent to which the opposing party may be prejudiced by the amendment and whether the movant has shown any justification for its delay in moving to amend. *DCPB,* 957 F.2d at 917–18; *Quaker State Oil Ref. Corp. v. Garrity Oil Co.,* 884 F.2d 1510, 1517 (1st Cir.1989) (parties seeking the benefit of Rule 15(a) "have an obligation to exercise due diligence; unseemly delay, in combination with other factors, may warrant denial of a suggested amendment."); *Hayes v. New England Millwork Distrib., Inc.,* 602 F.2d 15, 19 (1st Cir. 1979) (it is clear that undue delay can be a basis for denial of a Rule 15(a) motion to amend). Consistent with that policy, our local rules specifically demand that, "[a]mendments adding parties shall be sought as soon as an attorney reasonably can be expected to have become aware of the

identity of the proposed new party." LR, D.Mass. 15.1(A).[2] Data General has offered no explanation for the four year delay in filing its motion to amend. This is not a case in which previously unknown or undisclosed facts were brought to light at a late stage of discovery or at trial. It appears from the record that Data General was aware of the parental relationship between GDS and Grumman as early as 1988. Moreover, Data General's unexplained delay has unfairly deprived GDS and Grumman of the ability to defend against the unpleaded issue. The vicarious liability of GDS was not an issue in discovery, in briefs filed with this court, in arguments made to the jury, or in the jury instructions. In a similar case, where a plaintiff was aware of the factual predicate of a claim but failed to raise it until after judgment, our court of appeals noted, "it would be both unfair, and substantially prejudicial, to permit the injection of a new and different theory of liability at the very stroke of midnight." *DCPB,* 957 F.2d at 918. Though GDS and Grumman obviously share some common interests, this fact alone cannot justify imposing liability against a new party on an untried theory of liability after the entry of judgment when the factual predicate for the claim was known almost from the inception of the case. The motion to amend the complaint is denied.

## II. *Defendant's Motion To Correct Judgment*

Grumman moves pursuant to Fed.R.Civ.P. 59(e) and 60(a) to delete the award of attorneys' fees and to correct the award of prejudgment interest in this court's January 29, 1993 judgment. The judgment orders, in relevant part, that "Plaintiff Data General Corporation recover of defendant Grumman Systems Support Corporation the sum of $27,417,000 plus interest thereon from March 22, 1988, at a rate of twelve percent (12%) per annum ($15,956,694), plus costs and attorneys' fees as hereafter determined by the Court."

### A. Attorneys' Fees

■ Grumman contends that attorneys' fees are available under the federal Copy-

2. Rule 15.1(A) became effective October 1, 1992, well before trial.

right Act, but are not recoverable under Mass.Gen.L. ch. 93, § 42 for misappropriation of trade secrets. Further, "By electing to take judgment on its state law trade secrets claim, [Data General] has irrevocably waived *any* right to *any* award of attorneys' fees." Defendant complains that Data General is impermissibly attempting to "cherry-pick" the best elements of recovery from the available state (punitive damages and 12% prejudgment interest) and federal remedies (attorneys' fees).

Data General opposes the motion, arguing that a plaintiff who prevails on a misappropriation of trade secrets claim may recover attorneys' fees and costs under state law. The plaintiff also asserts that there was no waiver of federal remedies because the judgment entered by this court awarded $27,417,-000 in compensatory damages on both its state and federal claims. Moreover, Data General asserts that First Circuit precedent does not compel a prevailing plaintiff to choose between nonduplicative state and federal remedies. So long as a plaintiff is not twice compensated for a single injury, a judgment may be comprised of elements drawn from separate state and federal remedies.

The language of the judgment does not support Grumman's claim that Data General "waived *any* right to *any* award of attorneys' fees" pursuant to federal statute. The judgment awards $27,417,000 in compensatory damages—the same amount the jury awarded on each of Data General's state and federal claims. Though the judgment does not expressly reference the federal copyright claim, I am unwilling to interpret this silence as a voluntary waiver of valuable federal remedies. Finding no waiver, I will allow Grumman's motion only if attorneys' fees are unavailable as a matter of law.

Grumman's assertion that Data General must elect between its state or its federal remedies, but not a combination of the two, finds support in a decision of the Second Circuit Court of Appeals, *Kelco Disposal, Inc. v. Browning–Ferris Indus.*, 845 F.2d 404 (2nd Cir.1988), *aff'd*, 492 U.S. 257, 109 S.Ct. 2909, 106 L.Ed.2d 219 (1989). In *Kelco*, the court affirmed an order of the district court that required the prevailing plaintiff to choose between its federal antitrust remedy (treble damages, attorneys' fees, and costs) and its state tort remedy (compensatory and punitive damages). *Id.* at 411. The holding of *Kelco*, however, was limited to the facts of that case. *Id.* ("This is one of those cases where the tail must go with the hide."). The holding resulted from the court's analysis of the substantive provisions of federal antitrust law, its enforcement provisions, and the public interests protected by federal law. *Id.* Whatever the relevance of the decision to cases outside of the antitrust context, *Kelco* is not the law in the first circuit.

Where federal and state remedies address the same injury, our court of appeals has repeatedly upheld judgments that draw from both state and federal remedies. In *Schroeder v. Lotito*, 747 F.2d 801, 802 (1st Cir.1984) (per curiam), a trademark infringement case, our court of appeals affirmed a district court's order that awarded the plaintiff an injunction pursuant to federal law, an accounting of profits under state law (though unavailable under federal law), and attorneys' fees and costs under federal law (though probably unavailable under state law). Similarly, in *Aubin v. Fudala*, 782 F.2d 280 (1st Cir.1983), *appeal on attorneys' fees*, 782 F.2d 287 (1st Cir.1986), *appeal after remand*, 821 F.2d 45 (1st Cir.1987), a jury awarded the plaintiff $300,000 on a state law negligence claim and nominal damages on a related federal civil rights claim. The court held that the prevailing plaintiff was entitled to pre-judgment interest on his state law tort claim and attorneys' fees on his federal civil rights claim. *Id.* at 289–91. Were the law as Grumman contends, the court of appeals would have required the plaintiffs in these cases to choose between their state and federal remedies. But instead, the court affirmed the verdicts which drew remedies from both state and federal law.

Grumman contends that a more recent decision, *Freeman v. Package Mach. Co.*, 865 F.2d 1331 (1st Cir.1988) established a "one slice" rule of recovery that prohibits Data General's claim for attorneys' fees:

To be sure, a plaintiff is entitled to only one full recovery, no matter how many different legal grounds may support the

verdict; but there is no basis for allowing the losing party to pick which of the overlapped awards it prefers to pay. In collecting the fruits of his victory, [plaintiff] was concededly entitled to only a single slice of the pie—but the choice of the slice was his.

*Id.* at 1345. I do not read *Freeman's* "one slice" rule as erecting a bar to Data General's recovery of attorneys' fees. *Freeman* is aimed at duplicative remedies; it does not prohibit a plaintiff from combining state and federal remedies so long as the combination does not result in a double recovery. Indeed, *Freeman* expressly relied on (rather than overruling) *Aubin* and *Schroeder*, which combined non-duplicative state and federal remedies. *Id.* The court also expressly noted that the district court was "at liberty to award additional remedies [to the jury's federal verdict] which were (1) supported by the record, and (2) available under state law." *Id.* Subsequent decisions of our court of appeals are consistent with this holding. For example, in *Powers v. Grinnell Corp.*, 915 F.2d 34, 39–42 n. 6 (1st Cir.1990), the court affirmed a district court's order that required a plaintiff to elect between liquidated damages available under federal law and pre-judgment interest available under state law because the plaintiff would recover twice for the same loss.

My review of first circuit precedent reveals no bar that prevents a successful plaintiff from obtaining remedies on both state and federal grounds where the claims are related and the remedies are nonduplicative. Moreover, Grumman has failed to argue, much less demonstrate, that an award of attorneys' fees would result in duplicate recovery by Data General. The award of attorneys' fees compensates Data General for the costs of litigation and is not duplicated by the award of compensatory damages, pre-judgment interest, or punitive damages.

Finding that Data General did not waive, voluntarily or as a matter of law, its right to

an award of attorneys' fees under the federal Copyright Act, I do not decide whether the same remedy is also available under Mass. Gen.L. ch. 93, § 42. The motion to delete the award of attorneys' fees is denied.

## B. Pre-judgment Interest

■ As required by Mass.Gen.L. ch. 231, § 6B,[3] the clerk of this court awarded Data General pre-judgment interest on the jury's award of compensatory damages at the rate of 12% per annum from March 22, 1988, the date the action was commenced. Grumman complains that the $15,956,694 award of pre-judgment interest is excessive because interest was calculated on the entire award from the date the action was commenced, despite the fact that a majority of the damages were incurred between 1989 and 1992. The defendant, however, acknowledges that pre-judgment interest was calculated in conformity with the text of the statute and controlling precedent, *Charles D. Bonanno Linen Service, Inc. v. McCarthy*, 708 F.2d 1 (1st Cir.), *cert. denied*, 464 U.S. 936, 104 S.Ct. 346, 78 L.Ed.2d 312 (1983), but contends that the application of the general rule to the facts of this case would be grossly unfair. Grumman also asserts that the judgment conflicts with the jury's Special Verdict, which awarded only $6,360,744 in interest on the federal copyright claim.

*Bonanno* considered and rejected the argument now raised by Grumman. In *Bonanno*, the defendants objected that plaintiff would receive a windfall recovery if pre-judgment interest were awarded for losses accruing after the commencement of the action. The district court rejected the challenge, reasoning:

One may view the legislature's choice of the date of commencement of the action as a reasonable accommodation of competing interests. On the one hand, it fails to redress loss fully because it does not provide interest or any alternative form of

---

3. Mass.Gen.L. ch. 231, § 6B provides, in relevant part:

In any action in which a verdict is rendered or a finding made or an order for judgment made for pecuniary damages for personal injuries to the plaintiff or for consequential damages, or

for damage to property, there shall be added by the clerk of court to the amount of damages interest thereon at the rate of twelve per cent per annum from the date of commencement of the action....

compensation for delay in payment between the date earlier losses were incurred and the date of commencement of the action. On the other hand, it causes interest to be calculated from a date preceding losses accruing after the action is commenced. Thus, a "shortfall" in one respect is counterbalanced by a "windfall" in another respect. The legislature is free, of course, to provide for such an accommodation, and especially so when, as in the calculation of prejudgment interest, there is value in having a fixed rule for mathematically calculable interest to avoid the costs and delays incident to disputes over details such as might be presented here if interest were awarded separately on many elements of damages from many different dates of accrual.

*Charles D. Bonanno Linen Service, Inc. v. McCarthy*, 550 F.Supp. 231, 246–47 (D.Mass. 1982). The court of appeals affirmed this statement, reiterating that § 6B establishes a simple, mechanical rule under which the clerk simply adds to the court's total award interest thereon from the date of the commencement of the action. *Bonanno*, 708 F.2d at 12. The Massachusetts Supreme Judicial Court has cited *Bonanno* with approval. *College–Town v. Massachusetts Comm'n Against Discrimination*, 400 Mass. 156, 508 N.E.2d 587, 595 (1987).

In light of the balance struck by the legislature and controlling precedent of our court of appeals, I am not at liberty to adjust the award of pre-judgment interest to account for the precise date the various damages accrued. Neither the text of § 6B nor the *Bonanno* opinion permit such an exception.

Finally, Grumman's claim that the court's award of pre-judgment interest ignores the damage theory used by the jury to calculate interest on the copyright infringement claim is frivolous. The award of pre-judgment interest under state law is not determined or limited by the jury's findings on the federal copyright claim. Moreover, throughout the trial I have explained that interest on the federal claim would be determined by the jury, while interest on the state trade secret claim would be awarded by the court. The defendant never objected to my statement of the law during trial nor at the conclusion of trial when I expressly instructed the clerk to calculate pre-judgment interest on the state-law claim.

## III. Defendant's Motion For New Trial Or, In The Alternative, A Remittitur

Seeking to correct the wayward work of what Grumman perceives as a runaway jury, defendant urges this court to set aside the verdict and grant a new trial pursuant to Fed.R.Civ.P. 59(a). Grumman's primary contention is that the compensatory damages awarded by the jury totalling $27,417,000 are speculative and excessive. Defendant also argues that a new trial is warranted because plaintiff made material misrepresentations to the court and jury regarding its copyright deposits, the testimony of George Tasso was used improperly to create an inference of Grumman's criminality, and this court made numerous errors when it charged the jury. Data General opposes the motion and refutes each charge of error.

■ A request to set aside a jury's verdict is not to be taken lightly. Though the trial court may weigh the evidence and assess the credibility of witnesses in deciding such a motion, *Insurance Co. of N. Am. v. MUSA*, 785 F.2d 370, 375 (1st Cir.1986), a jury verdict that is supported by the evidence may not be set aside simply because the trial judge would have reached a different result. *CVD, Inc. v. Raytheon Co.*, 769 F.2d 842, 848 (1st Cir.1985), cert. denied, 475 U.S. 1016, 106 S.Ct. 1198, 89 L.Ed.2d 312 (1986). A district court should set aside a verdict only where "the verdict is against the clear weight of the evidence, or is based upon evidence which is false, or will result in a clear miscarriage of justice." *Id.* (citations omitted); *MUSA*, 785 F.2d at 375. After reviewing the record and evaluating Grumman's arguments, I conclude that the jury's verdict is well-grounded in the evidence. While I might not have reached precisely the same damage award, the jury's verdict was, nonetheless, the product of careful deliberation on the evidence presented in this case. The motion is denied.

### A. Compensatory Damages

■■ A prevailing plaintiff in a copyright action is entitled to recover for the actual losses it sustained as a result of the infringing activity, including lost profits from lost customers. The Copyright Act provides, in part:

> The copyright owner is entitled to recover the actual damages suffered by him or her as a result of the infringement, and any profits of the infringer that are attributable to the infringement and are not taken into account in computing the actual damages. In establishing the infringer's profits, the copyright owner is required to present proof only of the infringer's gross revenue, and the infringer is required to prove his or her deductible expenses and the elements of profit attributable to factors other than the copyrighted work.

17 U.S.C.A. § 504(b) (West 1977). Grumman complains that the jury awarded speculative and excessive damages because it uncritically adopted the plaintiff's damage analysis in its entirety which was built on theoretically unsound and factually inaccurate assumptions.[4] More specifically, defendant contends that the plaintiff's damage analysis failed to identify relevant revenues, failed to apply a reasonable profit margin, and failed to apportion service profits between infringing and non-infringing activities.

Grumman finds several problems with the revenue base from which damages were calculated. The evidence presented a trial established that MV/ADEX,[5] the copyrighted diagnostic software at issue in this case, was not used at every customer site, nor on every service call. The frequency with which MV/ADEX was used by Grumman was a contested trial issue, with estimates ranging from less than 1% to more than 50% of the service calls. Grumman claims that the jury award was excessive because it was based on all Grumman service revenues, including service calls when MV/ADEX was not infringed. The jury, however, was entitled to find that MV/ADEX was used extensively and was essential to Grumman's business of maintaining Data General MV computers. As Data General argued at trial, the frequency with which MV/ADEX was used was less important than the ability it conferred on Grumman to resolve complex, difficult problems that might arise only occasionally. When a computer failure has the potential to paralyze entire segments of an organization, customers demand a service company that can quickly fix all the problems, even the hard ones, all the time. There was considerable, though not undisputed, evidence to show that Grumman management, service technicians, and customers thought Grumman could not compete effectively without using MV/ADEX. The jury was not required to believe defendant's evidence to the contrary and could reasonably conclude that Grumman could not have been in the business of servicing MV computers but for its possession and use of MV/ADEX.

Second, Grumman complains that plaintiff's damage calculation included profits that Data General would have earned from (1) servicing 16-bit computers owned by Grumman's MV computer customers and (2) from selling MV-related equipment to these customers. There was no evidence showing that MV/ADEX was used to service Data General 16-bit computers or non-MV peripherals. Thus, Grumman argues these revenues were improperly included in the damage analysis. However, there was reliable evidence linking Grumman's 16-bit revenues to its 32-bit revenues. Customers prefer to have one maintainer service all of their computer equipment made by a single manufacturer, in this case Data General 16- and 32-bit computers. As a result, the jury could have reasonably concluded that if Grumman could not have effectively serviced Data General 32-bit computers, it would not have obtained the 16-bit revenues that flowed from the same customers. Grumman's argument concerning MV-related equipment sales fails for the same reason. While strictly speaking the MV/ADEX diagnostic software was not actually used to sell equipment upgrades, the evi-

---

4. The jury's award is within a few percent of the damage assessment offered by Data General's accounting expert.

5. This opinion uses MV/ADEX to refer to all revisions of MV/ADES and MV/ADEX, unless specifically noted otherwise.

dence showed that the use of MV/ADEX enabled Grumman to create and maintain customer service relationships that afforded Grumman the unique opportunity to sell additional equipment. The jury could have reasonably concluded that if Grumman had not infringed MV/ADEX, Data General would have obtained its historic market share of these customers and made the same equipment sales.

Third, Grumman voices two objections to the award of lost profits during the period after this court issued a preliminary injunction enjoining Grumman from using MV/ADEX. The defendant informed all of its MV customers in the beginning of 1989 of the preliminary injunction and explained that it would no longer be using MV/ADEX. However, the jury found, with ample support of the record, that Grumman continued to use MV/ADEX even after this court specifically enjoined such activity. Grumman's claim that the customer notice somehow precludes an award of damages, despite its continued use of MV/ADEX, is frivolous. Grumman's second objection focuses on the period of time after June 1990, for which there is no evidence that Grumman used MV/ADEX. Data General's damage analysis includes revenues earned by Grumman for MV service contract renewals after June 1990, including approximately $1.3 million for the continuing value of the contracts beyond 1992. The jury made no error when it concluded that post-injunction use of MV/ADEX enabled Grumman to retain service business that would have otherwise been lost. Moreover, the jury heard credible evidence that service relationships, once established, have a tendency to continue for an extended period of time; particularly where, as here, numerous customers signed multi-year contracts during the period of time Grumman was infringing MV/ADEX. The 1989 customer notice does not preclude such a finding.

Fourth, Grumman contends that Data General's damage analysis is overstated because it applies Data General prices to Grumman revenues and assumes that Data General would have obtained nearly 95% of Grumman's MV-related business had Grumman not used MV/ADEX. Grumman asserts

that the jury should have considered the "return rate" of customers who had already opted for third party maintenance, rather than using Data General's overall market share. Though defendant's arguments might suggest an alternative means of calculating damages, the jury was not compelled to accept Grumman's theory. The evidence fully supported the jury's findings. Historical data showed that Data General secured in excess of 90% of the available service business (95% if the market share held by MV/ADEX infringers is removed) in spite of its higher prices and allegedly low customer satisfaction. I find no error in the jury's determination that Data General would have enjoyed its historical market share of the service business, at its customary prices, had Grumman not been able to secure customers through infringing MV/ADEX.

In addition to Grumman's numerous challenges to the revenue base used in Data General's damage analysis, defendant questions the profit margin applied to those revenues and the failure to apportion profits between infringing and non-infringing activities. Data General's profit analysis applied an incremental profit margin of 73% to the revenues lost to Grumman; in some post-injunction years, the margin exceeded 90%. Grumman labels Data General's accounting expert as inexperienced and his analysis of variable costs as inaccurate. Defendant claims that the regional approach taken by Data General significantly underestimated variable costs by masking labor shortages at branch offices and ignoring service response time. In contrast, Grumman asserts that the analysis of its own expert which utilized a branch analysis is inherently more reliable. Grumman submits that a generous incremental profit margin would be 28%, cutting plaintiff's damages by nearly two-thirds. Data General, on the other hand, defends its expert and attacks Grumman's analysis as distorted: defendant's labor capacity calculation offered no analysis for any year prior to 1990 and made certain questionable adjustments from Grumman's own internal analysis. The jury heard extensive, conflicting expert testimony on these issues and ultimately elected to credit Data General's analysis as more reliable. Data General's analysis examined

the actual, historical Grumman equipment base, calculated the amount of work required to maintain those machines, and compared this work load with available Data General labor capacity, giving consideration to the geographic proximity of the customer and available labor. The regional approach taken by Data General was not solely a product of this litigation, but reflected plaintiff's actual management style and operations. The jury made no error in accepting Data General's profit analysis. Similarly, the jury was free to reject the testimony of Grumman's primary expert, Mr. Blumberg.

Grumman's final challenge to the damage award asserts that the jury failed to apportion profits between Grumman's infringing and non-infringing activities. The copyright act permits an infringer to defend by proving elements of profit that were attributable to factors other than the copyrighted work. 17 U.S.C. § 504(b). Since MV/ADEX was not used on every machine, at every location, on every service call, Grumman claims the infringement of MV/ADEX cannot account for 100% of the profits. Moreover, Grumman argues that even if MV/ADEX was essential to Grumman's service business, the infringement was only one of a number of essential elements that generated service revenue. As I previously explained, there was ample, though not uncontradicted, evidence to support the jury's conclusion that MV/ADEX was used extensively and was essential to Grumman's service business. While Grumman was entitled to attempt to prove that some profits were attributable to factors other than its use of MV/ADEX, the jury was not required to believe the defendant's evidence, particularly in light of Grumman's assertion that MV/ADEX accounted for less than 1% of its profits.

Moreover, apportionment cannot be reduced to the mechanical process that Grumman argues the jury was compelled to follow. For example, if MV/ADEX were used by Grumman employees only 10% of the time, it does not follow that MV/ADEX accounted for only 10% of Grumman's profits. Even if

used infrequently, the jury could find that MV/ADEX enabled Grumman to be in the business of maintaining MV-machines. The meteoric success of some computer-related businesses compared with the sudden death of others demonstrates that sometimes a single technological innovation, software program, or service advantage can determine a company's future. This is not a case where a defendant has incorporated copyrighted material within a larger work that included both copyrighted and newly created work. Rather, Grumman copied MV/ADEX *in toto* and then used the program in the regular course of business. Further, Grumman's contributions to profits were not ignored. Its routine contributions of labor and equipment were accounted for and compensated through the deduction of defendant's costs. The jury was free to consider both the frequency with which MV/ADEX was used and more qualitative factors, such as MV/ADEX's ability to draw and retain customers and the additional capacities it conferred to Grumman. It was not error for the jury to conclude that but for Grumman's use and possession of MV/ADEX, it could not have engaged in the service business.

### B. Copyright Deposits

During its case in chief, Data General introduced into evidence the Certificates of Registration for each copyrighted version of MV/ADEX. The Copyright Act provides that a Certificate of Registration is *prima facie* evidence of the validity of the copyright and the facts contained in the certificate. 17 U.S.C.A. § 410(c) (West 1977). In its case, Grumman attacked the validity of the certificates by pointing to a small difference between the MV/ADEX Rev. 0.0 deposit that had been filed with the Copyright Office and the object code for that same version of MV/ADEX.[6] In its rebuttal case, Data General for the first time informed this court and jury that it had made several clerical errors when making its initial deposits with the Copyright Office for MV/ADEX Revisions 0.0

---

6. The primary label block on one page of the Copyright Office deposit contained the date 1982, whereas the object code introduced at trial was dated 1983, and according to defendant's expert there were other discrepancies, but his testimony as to the existence and significance of these discrepancies was contested, and thus a matter for the jury's evaluation.

through 3.0. Data General explained that it discovered the errors in the initial deposits only after it investigated the anomaly raised by Grumman during trial. I am confident that the initial errors were innocent, as was the timing of Data General's disclosure.

Grumman complains that I should have allowed its motion for mistrial because Data General put on its case in chief in rebuttal, depriving Grumman of adequate time and opportunity to respond to the deposit errors. I cannot agree that the way in which the deposit errors were discovered prejudiced Grumman's defense. Indeed, the certificates' validity was tested in precisely the manner contemplated by the Copyright Act: the plaintiff answered the defendant's attacks on the certificates' *prima facie* validity. Moreover, Grumman attempts to give the certificates and the errors therein, far more importance than they deserve. Though copyright registration is a prerequisite to suit, 17 U.S.C.A. § 411(a) (West 1993), copyright protection exists without regard to registration. 17 U.S.C.A. § 408(a) (West 1993); *Computer Assoc. Int'l, Inc. v. Altai, Inc.*, 775 F.Supp. 544, 556 (E.D.N.Y.1991), *aff'd*, 23 U.S.P.Q.2d 1241 (2nd Cir.1992), *vacated in part*, 982 F.2d 693 (2nd Cir.1992). Grumman had an adequate opportunity to explore the errors contained in the initial copyright deposits, to challenge Data General's explanation of those errors, and to argue these issues before the jury.

### C. George Tasso's Testimony

■ Grumman complains that this court improperly admitted the deposition testimony of George Tasso, a former field technician for Data General and a current employee of Grumman. During his deposition, Mr. Tasso repeatedly invoked his Fifth Amendment privilege against self-incrimination on a wide range of issues, including all questions regarding his employment agreement with Data General and whether he shared any copies of MV/ADEX with Grumman. Data General read excerpts from the deposition during trial and the jury was permitted to consider whether an adverse inference should be drawn against Mr. Tasso or Grumman based on his invocation of his Fifth Amendment privilege. Relying on *Veranda Beach Club Ltd. Partnership v. Western Sur. Co.*, 936 F.2d 1364 (1st Cir.1991), Grumman asserts that when an employee invokes the privilege for personal reasons, no negative inference can be drawn against the employer. Moreover, Grumman claims Mr. Tasso's testimony was improperly used to portray Grumman as a criminal enterprise.

I have addressed this issue several times, both prior to trial and from the bench during trial. I revisit the issue one last time to summarize my holding. *Veranda Beach* establishes no per se rule which insulates a corporate employer from any adverse inference based on an employee's invocation of his Fifth Amendment privilege. Rather, the court demanded that such an inference be based on something more than the mere existence of an employment relationship. "In a civil case, therefore, an individual's invocation of a personal privilege against self-incrimination cannot, without more, be held against his corporate employer in circumstances analogous to those at the bar." *Veranda Beach*, 936 F.2d at 1374. There was little evidence in *Veranda Beach* to show that the corporate employer was closely involved in the disputed transaction or that the employer was aware of or benefited from the employee's alleged wrongdoing. Indeed, the trial court directed the verdict in favor of this corporate defendant, while claims against the individual employee and several other corporate defendants went to the jury. *Id.* at 1369–70.

Other courts that have considered the issue have permitted a jury, under certain circumstances, to draw an adverse inference against an employer when its employee invokes the Fifth Amendment privilege against self-incrimination. *RAD Serv., Inc. v. AETNA Casualty and Sur. Co.*, 808 F.2d 271, 274–278 (3rd Cir.1986); *Brink's, Inc. v. City of New York*, 717 F.2d 700, 708–10 (2nd Cir.1983). Noting the sensitivity of the issue and potential for abuse, courts have eschewed a mechanical approach to determining whether the jury may hold the employee's silence against the employer. The courts have relied, instead, on a careful analysis of the facts to determine whether an

adverse inference may be properly drawn against the employer.

In this case, Data General laid a sufficient foundation to support the admission of Mr. Tasso's deposition. Grumman's President, Mr. Mulderig, testified that Grumman obtained one or more revisions of MV/ADEX by hiring former Data General employees who had taken copies of MV/ADEX from Data General. Mr. Mulderig also testified that he was informed sometime in 1988 by a subordinate that Mr. Tasso had taken a copy of MV/ADEX when he left Data General's employ in mid–1987 and came to work for Grumman. As a field technician, Mr. Tasso was not an officer of Grumman nor a managerial employee; nonetheless, his alleged wrongdoing is highly relevant to determining how Grumman came to possess over 200 copies of MV/ADEX and whether Grumman acquired those tapes in good faith. Grumman acknowledged that it had never purchased MV/ADEX from Data General, never explained how it acquired so many tapes, and apparently made no effort to investigate whether Mr. Tasso had brought a Data General tape with him and whether that tape was being used or copied by other Grumman employees.

In sum, the evidence showed that Grumman learned that Mr. Tasso brought the tape from Data General, turned a blind-eye to Mr. Tasso's potential continued wrongful use of MV/ADEX, and probably shared in the rewards of Mr. Tasso's apparent wrongdoing by not returning the tape. Mr. Tasso was still employed by Grumman at the time of trial. Grumman's President acknowledged these very facts. Under the circumstances of this case, Grumman cannot complain that the jury was *permitted* to draw a negative inference against Grumman from Mr. Tasso's silence.

Defendant's claim of unfair prejudice fairs no better. Data General's repeated claims that Grumman "stole" MV/ADEX were supported by the evidence and, as Grumman conceded during trial, relevant to show that Grumman wrongfully misappropriated MV/ADEX, to counter Grumman's "good faith" defense, and to determine the availability of doubled trade secret damages. Mr. Tasso's

testimony was one of many pieces of evidence that tended to establish that Grumman misappropriated the MV/ADEX tapes. While Mr. Tasso's testimony may have proven damning to Grumman, our rules of evidence do not protect a litigant from facing the sometimes harsh reality of its own actions. Rather, the rules protect against unduly prejudicial evidence that tends to inflame the jury or appeal purely to emotional elements. Here, the evidence was relevant and cast no unfair shadow on Grumman.

### D. The Jury Charge

Grumman charges this court made eleven separate errors of law when charging the jury, each of which warrants a new trial on all issues. I have carefully considered Grumman's arguments, but find no error in the jury instructions. I omit any further discussion here because all of the issues raised by Grumman have been adequately addressed by this or prior opinions.

### IV. Defendant's Motion For Judgment As A Matter Of Law

Pursuant to Fed.R.Civ.P. 50(b), Grumman urges this court to enter judgment for the defendant as a matter of law, contending that Data General failed to prove the content of its copyright, the validity of its copyright registrations, the infringement of the registered copyright, the identity of the alleged trade secrets, the wrongful misappropriation of such trade secrets, and the adequacy of the protection of such trade secrets. Alternatively, Grumman moves for a new trial under Fed.R.Civ.P. 59(a).

Our court of appeals has explained that the standard for granting a motion for judgment n.o.v. is "very rigorous." *MacQuarrie v. Howard Johnson Co.*, 877 F.2d 126, 128 (1st Cir.1989). Grumman's motion can be allowed only if the evidence and all reasonable inferences drawn therefrom, when viewed in a light most favorable to the verdict, could lead all reasonable persons to but one conclusion. *Id.* In making its determination, a district court may not weigh the evidence, determine the credibility of the wit-

nesses presented, or attempt to resolve conflicting testimony. *Id.*

### A. The Copyright Claim

■ To prevail on its claim of copyright infringement, Data General was required to prove (1) that it is the owner of a work protected by the Copyright Act, and (2) that Grumman copied that work without authorization. *E.g., Motta v. Weiser, Inc.,* 768 F.2d 481, 483 (1st Cir.), *cert. denied,* 474 U.S. 1033, 106 S.Ct. 596, 88 L.Ed.2d 575 (1985). In addition, as a prerequisite to suit, Data General was required to prove that it duly registered its copyright claim with the Copyright Office. 17 U.S.C.A. § 411(a). Despite Grumman's best efforts to obscure the forest by focusing on the trees, the jury properly concluded, based on ample evidence, that Grumman infringed Data General's copyright in MV/ADEX.

### 1. *Copying a protected work*

■ Grumman argues that it is entitled to judgment in its favor because Data General failed to prove that the MV/ADEX computer programs admittedly copied and used by Grumman were the same works in which Data General held copyrights. More specifically, Grumman asserts that Data General was required to prove that the *object code* programs copied by Grumman are the same as the *source code* programs registered with the Copyright Office.[7] Since Data General did not produce the source code for any version of MV/ADEX, it is argued that Data General could not prove that Grumman's admitted use of the object code programs infringed the source code programs registered with the Copyright Office. As I explained in my October 9, 1992 ruling, Grumman's argument is flawed.

Contrary to Grumman's understanding, the materials deposited with the Copyright Office do not define the substantive protection extended to the registered work. Indeed, the Copyright Act expressly provides

that copyright "registration is not a condition of copyright protection," and may be obtained at any time during the subsistence of the copyright. 17 U.S.C.A. § 408(a). Since copyright protection exists without regard to copyright registration, it follows that the deposit that accompanies a registration cannot by itself define the copyrighted work. In this case, the source code deposits that were made with the Copyright Office were merely symbols, rather than definitions, of the protected work. *See Midway Mfg. Co. v. Artic Int'l, Inc.,* 211 U.S.P.Q. (BNA) 1152, 1158 (N.D.Ill.1981) ("It is the work that cannot be copied or incorporated and not the specific tangible expression on file in the Copyright Office."). Thus, Data General held copyrights on the various versions of the computer program MV/ADEX, not the source code version of MV/ADEX.

Similarly, Grumman misconceives as three separate programs the registered computer program, source code version of that program, and object code version of that program. Though Grumman has admittedly used MV/ADEX in its object code form, it claims there was no proof that it infringed the "registered source code program." The Copyright Office, however, "considers source code and object code as two representations of the same computer program. For registration, purposes, the claim is in the *computer program* rather than in any particular representation of the program." Copyright Office, Compendium II of Copyright Office Practices § 321.03 (1984) (emphasis in original); *e.g. Apple Computer, Inc. v. Franklin Computer Corp.,* 714 F.2d 1240, 1249 (3rd Cir.1983), *cert. dismissed,* 464 U.S. 1033, 104 S.Ct. 690, 79 L.Ed.2d 158 (1984). Accordingly, while Data General had the burden of proving that Grumman copied MV/ADEX in one of its protected forms, Data General could meet that burden by showing infringement of either the source code or the object code version of MV/ADEX.

At trial, Data General introduced the master object code program for each version of

---

7. Generally, a computer program is written by a programmer using "source code," a computer language that uses a combination of words, symbols, and numbers that are meaningful to a trained programmer. The source code is then

compiled by a computer into "object code," a binary machine language appearing as a series of 0's and 1's that is unintelligible to even a trained human observer. A computer runs a program using object code.

MV/ADEX and Mr. Gove, Data General's expert, testified that he compared each major revision of the MV/ADEX tapes used by Grumman to the master object code programs and found them to be identical in all material respects. In addition, the jury heard testimony that Grumman service employees regularly used MV/ADEX object code tapes on service calls, Grumman employees stored the various versions of MV/ADEX in computer libraries so that additional copies could be made to replace worn-out versions, and Grumman had an informal network to distribute recently appropriated copies of MV/ADEX. Grumman employees referred to these programs as "MV/ADEX", usually identifying the specific revision to which they were referring or requesting. Moreover, hundreds of tapes labeled as MV/ADEX that were recovered from Grumman were introduced into evidence. Grumman's contention that it is entitled to judgment because Data General failed to prove infringement is frivolous. The jury was clearly entitled to find that Grumman infringed Data General's copyrights.

Grumman also argues that without an analysis of the MV/ADEX source code, Data General could not prove that Grumman copied protectable elements of MV/ADEX. Defendant contends that the expression, originality, modular composition, and functionality of MV/ADEX must be examined to determine which elements are copyrightable and whether those elements were copied by Grumman. In many cases, such an analysis is critical to determining whether the defendant actually infringed the plaintiff's copyright. For example, in a recent, erudite opinion by Judge Walker, the Second Circuit Court of Appeals engaged in a detailed, three-step analysis of the copyrighted work's code, structure, and function to determine whether the infringing program was substantially similar to the protected work. *Computer Assoc. Int'l, Inc. v. Altai, Inc.*, 982 F.2d 693, 701–715 (2nd Cir.1992). *Computer Assoc.*, however, addressed an issue not raised by Data General's copyright claim.

A plaintiff may show unauthorized copying of an copyrighted work in one of two ways: (1) by submitting evidence that the defendant directly copied the work or (2) by showing the defendant had access to plaintiff's copyrighted work and that defendant's work is substantially similar to the plaintiff's copyrighted work. *Computer Assoc.*, 982 F.2d at 701; *Eckes v. Card Prices Update*, 736 F.2d 859, 863 (2nd Cir.1984). *Computer Assoc.* involved two allegedly infringing computer programs, one which was admittedly directly copied from the plaintiff's copyrighted work and one which contained none of the literal elements of the copyrighted work, but was alleged to be substantially similar. *Id.* at 700–01. The district court found that the first program, which directly incorporated approximately 30% of the source code of plaintiff's copyrighted work, infringed the plaintiff's copyright; a finding which the defendant did not pursue on appeal. *Id.* at 702. The appeal addressed the question of whether the second version of the defendant's program, which did not incorporate any of the literal elements of the plaintiff's copyrighted work, infringed the copyrighted work. *Id.* at 710–12. Though the second program did not directly copy any of the copyrighted work's source or object code, the plaintiff claimed the defendant's program infringed the non-literal elements of the plaintiff's program by utilizing a substantially similar structure and operating system. The appeal and the court's thorough analysis of the program's structure and code was aimed at determining substantial similarity of the copyrighted and infringing work, in the absence of direct copying.

Data General's copyright claim is similar to the first infringement claim in *Computer Assoc.* Data General proved infringement of its copyright through the most direct method: by showing that Grumman repeatedly copied 100% of the object code of Data General's MV/ADEX copyrights. It is only in the absence of such direct evidence that a plaintiff must resort to proving infringement by showing a defendant's access to the copyrighted work and substantial similarity of the infringing program. While the three-step analysis used in *Computer Assoc.* may be highly relevant to cases which lack direct evidence of copying, it is not applicable here. Unlike *Computer Assoc.* there was no evidence to suggest that Grumman indepen-

dently created the object code tapes; no evidence that Grumman incorporated only a portion of the MV/ADEX object code into a larger, original program; and no evidence that Grumman rewrote the object code tapes or somehow enhanced the software.

Nor was an analysis of the source code necessary to determine the validity of Data General's copyrights in MV/ADEX. The copyright registration is prima facie evidence of the validity of the copyright. 17 U.S.C.A. § 410(c). Grumman never produced sufficient evidence to rebut the validity of the copyrights. *Dynamic Solutions, Inc. v. Planning & Control, Inc.*, 646 F.Supp. 1329, 1337 (S.D.N.Y.1986) (a registration certificate relieves plaintiff of proving the many facts necessary to show ownership and validity of a copyright unless the defendant effectively challenges the presumption and shifts the burden of so doing to the plaintiff). To the contrary, the evidence demonstrated that Data General authored the program and that MV/ADEX constituted an original expression of a copyrightable work. The originality and nonobviousness of MV/ADEX can be inferred from the inability of competitors to replicate its operation. Forcing Data General to produce the source code would have added nothing to the trial, but would have placed an undue burden on Data General and risked serious trial delay and juror confusion.

### 2. Copyright registration

■ The jury found that Data General had validly registered each revision of MV/ADEX. Grumman asserts that this finding should be rejected as a matter of law because of errors contained in the copyright registration.

To register a claim of copyright, the Copyright Office requires an applicant to submit a completed application form, the statutory fee, and an appropriate deposit of the copyrighted work. 17 U.S.C.A. § 408(a); Compendium II of Copyright Office Practices § 603. In the case of a computer program that contains trade secret material, such as MV/ADEX, the Copyright Office permits the deposit to take the form of a symbolic filing: the first and last ten pages of the source code. 37 C.F.R. § 202.20(c)(2)(vii)(A)(2)

(1992). Data General filed registration applications with the Copyright Office for each revision of MV/ADEX.

The errors in the registration first came to light during trial. During its defense, Grumman compared the MV/ADEX revision 0.0 source code deposit made with the Copyright Office with the corresponding portion of the revision 0.0 object code tape. Grumman demonstrated that the source code deposit contains a date of 1982 in the primary label block, while the object code version contains a date of 1983. Several days later, after investigating the anomaly, Data General informed this court and then the jury that it had made several errors in the source code deposits made with the Copyright Office for revisions 0.0 through 3.0. The jury heard extensive testimony and argument from both parties as to the significance of these errors.

For MV/ADEX Revision 0.0, Data General submitted to the Copyright Office the first ten pages of a program called MTBOOT Revision 0, when it should have submitted the first ten pages of MTBOOT Revision 2. Both programs were authored by Data General and performed the same function, but the source code deposits for these revisions differed in several ways. Data General introduced the correct material into evidence and noted the variances with actual deposits. At page five, the Primary Label Block on the copyright deposit contains a copyright date of "1982," rather than "1983"; contains the designation "directory structure revision level 1," rather than "directory structure revision level 2"; and omits a line reading "BLK 2 ... starting physical block number." The Primary Label Block, which contains descriptive information about the tape, does not instruct or direct the computer. At page eight, the copyright deposit omits a line reading "BLK 2 ... starting physical block number (for disk compatibility)." With these four exceptions, the first ten pages are identical; the last ten pages contained no errors. Data General's expert, Mr. Gove, testified that he successfully ran a copy of MV/ADEX Revision 0 that was modified to reflect the errors in the copyright deposit.

For MV/ADEX Revisions 1.0 and 2.0, Data General submitted to the Copyright Office

the first ten pages of MTBOOT Revision 1, rather than the first ten pages of MTBOOT Revision 2. The source code actually submitted differed from the correct material in only one way: the Primary Label Block contains a copyright date "1982," rather than "1983." All remaining lines of code for the first and last ten pages were identical. The different copyright date had no effect on the operation of the program.

For MV/ADEX Revision 3.0, Data General properly submitted the first ten pages of Revision 3.0, but rather than depositing the *last* ten pages of the program, plaintiff submitted the last ten pages of the *next to last* program contained in MV/ADEX Revision 3.0. All materials deposited were from Revision 3.0.

There was absolutely no evidence that Data General knowingly misrepresented the deposits to the Copyright Office, obtained any benefit by making these errors, or acted with bad faith, either at the time of making the deposits or during trial. To the contrary, the evidence showed that Data General made several innocent, inadvertent errors in its copyright deposits and promptly informed this court as soon as those errors became known. There is no evidence that Data General realized the errors at any point before the issue emerged during trial. Grumman's claim that the deposit errors invalidate the copyright registrations is unsupported by the facts and unwarranted by law:

> Only the 'knowing failure to advise the Copyright Office of facts which might have occasioned a rejection of the application constitute[s] reason for holding the registration invalid and thus incapable of supporting an infringement action ... or denying enforcement on the ground of unclean hands....'

*Eckes,* 736 F.2d at 861–62 (citations omitted). Nor do cases cited by Grumman support its attack on the jury's verdict. In *Whimsicality, Inc. v. Rubie's Costume Co.,* 891 F.2d 452, 455 (2nd Cir.1989), the court explained that copyright certificates create a rebuttable presumption that the work in question is copyrightable. That presumption is generally not overcome by an innocent misstatement in the copyright application, but may be defeated by proof of deliberate misrepresentation. *Id.* The *Whimsicality* court found that since the copyright plaintiff knew that its work could not be copyrighted, it intentionally misrepresented its work in its copyright application in an attempt to obtain a certificate of registration. The court held the plaintiff did not have valid copyrights capable of enforcement. *Id.* at 456.

In *Dynamic Solutions,* the plaintiff filed copyright registrations which identified two software programs as being created in 1983 and 1984, respectively. The plaintiff, however, deposited versions of the software that existed at the time of filing in 1986 and made other unspecified errors in the deposits. *Dynamic Solutions,* 646 F.Supp. at 1341 n. 18. The 1983 and 1984 versions no longer existed, could not be reproduced, and the plaintiff could not identify how the programs had changed during the intervening period of time. *Id.* at 1341. The court explained that "[e]rrors on the registration application do not affect plaintiff's right to sue for infringement unless they are knowing and might have caused the Copyright Office to reject the application." *Id.*

The evidence wholly supports the jury's finding that Data General validly registered each revision of MV/ADEX.

### B. Misappropriation of Trade Secrets

To prevail on its claim that Grumman misappropriated Data General's trade secrets in MV/ADEX, Data General was required to show that (1) MV/ADEX is a trade secret; (2) Data General took reasonable steps to preserve the secrecy of MV/ADEX; and (3) Grumman used improper means, in breach of a confidential relationship, to acquire and use the trade secret. *J.T. Healy & Son, Inc. v. James A. Murphy & Son, Inc.,* 357 Mass. 728, 260 N.E.2d 723, 729–31 (1970); *USM Corp. v. Marson Fastener Corp.,* 379 Mass. 90, 393 N.E.2d 895, 899–903 (1979); *Curtiss–Wright Corp. v. Edel–Brown Tool & Die Co.,* 381 Mass. 1, 407 N.E.2d 319, 323–24 (1980); Laurence H. Reece, *Trade Secret Misappropriation: A Review and Analysis of Massachusetts Law,* 71 Mass. L.Rev. 171, 173 (1986). The evidence pro-

duced at trial amply supports the jury's verdict in Data General's favor.

### 1. MV/ADEX as a trade secret

 Grumman argues that it is entitled to judgment because Data General failed to identify the specific secret which was misappropriated by Grumman. Though the jury heard extensive testimony as to the function, effectiveness, and use of MV/ADEX, Grumman complains that Data General never produced the precise secret as embodied in the software's source code. Grumman initially offered no case law to support its argument. However, in its supplemental brief, Grumman relies on a recently decided opinion of the Ninth Circuit Court of Appeals, *MAI Sys. Corp. v. Peak Computer, Inc.*, 991 F.2d 511 (9th Cir.1993), for the proposition that a plaintiff must specifically identify the trade secrets which were purportedly misappropriated. Grumman asserts that without producing the source code and without identifying specific lines or sections of the source code, Data General could not prevail on its trade secret claim as a matter of law.

*MAI* shares some commonalities with the case before me. A computer manufacturer, who also serviced the computers it sold, sued an independent computer maintenance company for, among other things, copyright infringement and misappropriation of trade secrets. *MAI*, 991 F.2d at 513–514. The plaintiff's trade secret claim alleged infringement of its customer data base, field information bulletins, and software. The district court granted summary judgment in plaintiff's favor on all three trade secret grounds, though the plaintiff's brief addressed neither the software nor the field information bulletins. *Id.* at 520. The only evidence establishing that the software contained trade secrets was a conclusory statement that the diagnostic software "contain[s] valuable trade secrets." *Id.* at 523. The court of appeals reversed the award of summary judgment because the plaintiff failed to satisfactorily identify the purported trade secret. *Id.* at 522–523. "[A] plaintiff who seeks relief for misappropriation of trade secrets must identify the trade secrets and carry the burden of showing that they exist." *Id.* at 522.

Though *MAI* shares some similarities to the case before me, the facts of the two cases and their procedural histories are quite distinct. *MAI* arose under California law, was decided by the district court's *sua sponte* award of summary judgment in the *plaintiff's* favor, based on an unsupported assertion that a trade secret existed. In this case, a jury found in the plaintiff's favor after a nine-week trial which involved extensive testimony concerning the misappropriated trade secret.

To the extent *MAI* is relevant to our case, it supports the verdict. Grumman contends that as applied to this case, *MAI's* "specific identification" requires Data General to point to individual trade secrets in the MV/ADEX source code. *MAI*, however, does not go so far. The court was unwilling to allow a plaintiff to prevail on summary judgment by baldly asserting the existence of some undefined trade secret. To that end, the *MAI* court demanded that the plaintiff describe the subject matter of the trade secret with sufficient particularity to separate it from matters of public knowledge, to permit the defendant to ascertain the boundaries of the secret, and to give the defendant notice of the issues to be met at trial—this was the holding of the two California cases upon which *MAI* relied to reach its result. *Diodes, Inc. v. Franzen*, 260 Cal.App.2d 244, 67 Cal.Rptr. 19, 24 (1968); *Universal Analytics, Inc. v. MacNeal–Schwendler Corp.*, 707 F.Supp. 1170, 1177 (C.D.Cal.1989), *aff'd*, 914 F.2d 1256 (9th Cir.1990). Moreover, one of the cases relied on by *MAI* expressly rejected the detailed identification requirement that Grumman argues *MAI* establishes. In *Diodes*, the court explained,

> One who seeks to protect his trade secrets from wrongful use or disclosure does not have to spell out the details of the trade secret to avoid a demurrer to a complaint. To so require would mean that the complainant would have to destroy the very thing for which he sought protection by making public the secret itself.

*Diodes*, 67 Cal.Rptr. at 24. I cannot believe that the Ninth Circuit intended to overrule a case, *sub silentio*, upon which it expressly relied.

Under the governing law of this case, Massachusetts law, "[a] trade secret may consist of any formula, pattern, device or compilation of information which is used in one's business, and which [provides] an opportunity to obtain an advantage over competitors who do not know or use it. . . . The subject matter of a trade secret must be secret. Matters of public knowledge or of general knowledge in an industry cannot be appropriated by one as his secret." *J.T. Healy*, 260 N.E.2d at 729 (quoting Restatement of Torts § 757, comment b.) The existence of a trade secret depends on the facts of each case. *Jet Spray Cooler, Inc. v. Crampton*, 361 Mass. 835, 282 N.E.2d 921, 925 (1972). Here, the jury was instructed to consider a number of factors, including the nature of the information and the conduct of the parties, and concluded that MV/ADEX was a trade secret—a conclusion well-supported by the evidence.

 Several witnesses, including two Grumman witnesses, testified that MV/ADEX contained trade secrets. This evidence was corroborated by testimony about the design, function, and use of MV/ADEX. The evidence showed that MV/ADEX was unique, effective, and conferred a competitive advantage to Data General in the computer service business. Data General's expert witness, Mr. Gove, explained that Data General developed numerous original programs for use in MV/ADEX and testified in some detail as to the more important functions and capabilities of those programs. In addition to this direct evidence, the jury was entitled to infer that MV/ADEX contained trade secrets because Grumman was unable to create functionally comparable diagnostic software. As discussed more fully below, there was no evidence to indicate that MV/ADEX was a matter of public knowledge. Data General took reasonable steps to preserve, and in fact did preserve, the secrecy of MV/ADEX. With the exception of those who lawfully licensed or unlawfully misappropriated MV/ADEX, Data General enjoyed the exclusive use of MV/ADEX. Even those who obtained MV/ADEX and were able to *use* MV/ADEX were unable to discover its trade secrets because MV/ADEX was distributed only in its object code form, which is essentially unintelligible to humans. An infringer may be liable for misappropriating trade secrets when it loads and runs a computer program in its object code form, even if the infringer never understands exactly how the program works. *Trandes Corp. v. Guy F. Atkinson Co.*, 798 F.Supp. 284, 288 (D.Md.1992).

## 2. *Reasonable steps to preserve secrecy*

 A plaintiff enforcing a trade secret must take reasonable and proper steps to preserve its secrecy. *USM*, 393 N.E.2d at 899–902; *CVD*, 769 F.2d at 851–52. Heroic measures, however, are not required. *Id.* Whether reasonable steps have been taken depends on the circumstances of each case, including the nature of the information sought to be protected and the conduct of the parties. *USM*, 393 N.E.2d at 902. Grumman argues that it is entitled to judgment because Data General failed to establish that it took reasonable steps to preserve the secrecy of its trade secret. Grumman's argument is contrary to the weight of the evidence.

Data General required employees to sign confidentiality agreements which prohibited the unauthorized disclosure of confidential or proprietary information; completed termination checklists, which specifically covered software, when an employee left the company; distributed a company brochure detailing the company's policy on protecting confidential and proprietary information, including software; deployed security guards; required visitors to sign in when visiting and prohibited unescorted visits; restricted employee access to the area in which MV/ADEX was developed; labeled MV/ADEX tapes as "property of Data General"; displayed a copyright notice on the exterior of MV/ADEX tapes and on the first display screen of the program itself; did not distribute MV/ADEX source code outside of Data General; and required customers to sign an agreement which, among other things, prohibited unauthorized disclosure to third parties. Grumman cites evidence to the contrary, focusing on perceived shortcomings in the safeguards and instances where Data General's procedures were not followed. The jury heard all testimony, weighed the evidence, and apparently rejected Grumman's evidence as unper-

suasive, as they were free to do. The jury properly concluded that Data General took reasonable steps to preserve the secrecy of the information embodied in the MV/ADEX programs.

### 3. *Grumman's misappropriation*

■ Grumman argues that Data General failed to prove that Grumman knowingly misappropriated MV/ADEX and goes so far as to make the remarkable statement that "there is no evidence that [Grumman] knowingly took anything in breach of a duty." The jury, for good reason, differed with Grumman's view of the evidence. Grumman admits that it took copies of MV/ADEX from customer sites and obtained copies from used MV machines on which MV/ADEX resided, but claims that Data General never proved the wrongful acquisition of any one of the hundreds of tapes in Grumman's possession. Grumman's argument is either totally contrary to the evidence or is based on a misunderstanding of the law. Grumman also asserts that the jury erred in rejecting Grumman's "good faith" defense, which alleged that it had a good faith belief that it had a license to use Data General diagnostics.

■ Though a defendant must "have notice of both the fact that the information claimed to be a trade secret is in fact secret and the fact that disclosure by the third person is a breach of duty before one is subject to liability for the use or disclosure of the trade secret," the requisite notice may be found where the defendant knew *or should have known* that the proffered information is the trade secret of another. · *Curtiss–Wright Corp.*, 407 N.E.2d at 323–24 (quoting Restatement of Torts § 757 (1939)) (emphasis added). "Studious ignorance" will not insulate a defendant from liability. *Id.* at 324. Moreover, courts have noted that the defendant's knowledge "often must be proved by the weight of credible circumstantial evidence." *Id.* (citing R. Milgrim, Trade Secrets § 504[3] at 5–102 (1978)). In this case, there was credible evidence from which the jury could infer that Grumman obtained MV/ADEX by taking property known to belong to another or by knowingly participating in the breach of an express or implied confiden-tiality agreement by, for example, a former employee or customer of Data General.

After this court issued a preliminary injunction enjoining further use of MV/ADEX by Grumman, the defendant returned more than 200 copies of MV/ADEX. Though Data General never proved how Grumman acquired all the tapes, neither could Grumman explain how it came into possession of so many tapes. It was undisputed that Grumman never purchased a copy of MV/ADEX from Data General. On the facts of this case, the unexplained possession of Data General's MV/ADEX tapes is more than suspicious. The tapes were labeled as "property of Data General" and, when run on a computer, displayed a copyright notice identifying Data General as its owner. For some tapes, a Grumman label had been pasted on top of the original Data General label. At the same time Grumman was collecting MV/ADEX tapes from unidentified sources, it was unsuccessful in its attempts to acquire MV/ADEX openly and directly from Data General under a licensing agreement. Moreover, Grumman admitted that it knew confidentiality agreements were widely used in the business to restrict disclosure of proprietary information by customers and former employees. In fact, an internal Grumman memorandum from 1987, which was reviewed by top Grumman officials, stated that use of MV/ADEX diagnostics was illegal unless purchased from Data General. A proper inference is that Grumman was acting with either studied ignorance or actual knowledge of the source of so many copies of a competitor's valuable software program.

Some of the tapes turned in by Grumman were pre-release versions of MV/ADEX. Pre-release versions of MV/ADEX were not sold, distributed, or permitted to leave Data General facilities. The jury could infer that Grumman's possession of these tapes demonstrated that it knew the tapes were taken directly from Data General or were being provided to Grumman by former Data General employees in violation of their employment agreements. This is consistent with Grumman's admission that it came to learn that George Tasso, a former employee of

Data General, brought a copy of MV/ADEX when he came to work for Grumman.

As for Grumman's proffered "good faith" defense, further discussion is unnecessary. The purported defense was not based on compelling facts and, in face of inconsistent evidence, the jury was free to reject Grumman's claim of good faith as incredible.

*V. Summary*

Data General's Motion For Leave To Add A Party And To Amend Complaint To Conform To The Evidence, Grumman's Motion To Correct Judgment, Grumman's Motion For A New Trial Or, In The Alternative, A Remittitur, and Grumman's Motion For Judgment As A Matter Of Law are all **DENIED.**